**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
Civil Action No. 01 C 000957

2003 JAN 15 P 3: 35

FILED
U.S. DISTRICT COURT
GREENSBORO, NC

| | |
|---|---|
| **BERNHARDT LLC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **COLLEZIONE EUROPA U.S.A.,** | ) |
| | ) |
| **Defendant.** | ) |

**DECLARATION OF BRETT M. HUTTON, ESQ.**
**IN SUPPORT OF COLLEZIONE"S BRIEF WITH RESPECT**
**TO CONSTRUCTION OF U.S. DESIGN PATENT NOS.**
**439,763, 438,727, 439,770, 441,975, AND 441,980 CLAIMS**

**BRETT M. HUTTON,** declares and says as follows:

1.      I am an attorney at the law firm of Heslin Rothenberg Farley & Mesiti P.C.

having offices at 5 Columbia Circle, Albany, New York. Heslin Rothenberg Farley & Mesiti

P.C. specializes in intellectual property law, including patents, trademarks and copyrights.

2.      I make this Declaration in Support of Collezione's Brief With Respect To

Construction of U.S. Design Patent Nos. 439,763, 438,727, 439,770, 441,975, and 441,980

Claims.

3.      I have been practicing intellectual property law exclusively for about four years

and have been registered to practice before the U.S. Patent and Trademark Office since 2000.

4.      I am co-counsel for Defendant Collezione Europa, U.S.A., Inc. (hereinafter

"Collezione") in the instant action with Plaintiff.

5.      On or about August 19, 2002, I received Plaintiff's answers to Defendant's

-1-

Second Interrogatories, which contained interrogatory responses listing the points of novelty of the patents in suit. A true and accurate copy of Plaintiff's Response to Defendant's Second Interrogatories is attached hereto as **Exhibit "A."**

6.     During discovery in the instant action, I deposed Mr. D. Scott Coley, one of the alleged inventors of the patents in suit, on October 28, 2002. A true and accurate copy of excerpts from Mr. Coley's deposition transcript is attached hereto as **Exhibit "B."**

7.     During discovery in the instant action, I deposed Mr. Thomas M. McDaniel, one of the alleged inventors of the patents in suit, on October 28, 2002. A true and accurate copy of excerpts from Mr. McDaniel's deposition transcript is attached hereto as **Exhibit "C."**

8.     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Declaration is true and correct.

Dated: January _8_, 2003

Brett M. Hutton, Esq.

ATTACHMENT/EXHIBIT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:01CV00957

| | |
|---|---|
| BERNHARDT, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COLLEZIONE EUROPA, USA, INC., | ) |
| | ) |
| Defendant | ) |
| | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S SECOND INTERROGATORIES

Plaintiff BERNHARDT, L.L.C. ("Bernhardt"), pursuant to Rules 26 and 33 of the Federal

Rules of Civil Procedure, responds to Defendant's Second Interrogatories as follows.

### GENERAL OBJECTIONS AND LIMITATIONS

Plaintiff's responses to each of Defendant's Interrogatories 16 - 21 are made subject to, and

without waiving, each of the following general objections and/or explanatory statements of

limitation.

1. Interrogatories 16 - 21 are unduly vague in that they fail to identify what, if any, prior

art is to be used as a basis for comparison. Defendant bears the burden of proving that any

references asserted against the patents-in-suit, other than prior art identified in the prosecution

histories, is, in fact, prior, by clear and convincing evidence. Defendant has thus far failed to

produce any corroborative evidence that any reference it has produced is, in fact, prior. Plaintiff is

not required to distinguish its patented designs from art that is not prior and will not do so. In the

absence of any evidence that any reference produced by Defendant is prior art, Plaintiff can only

state the points of novelty for each design in relation to the material prior art known to it, i.e., the prior art disclosed during the prosecution of the patents-in-suit.

2. Interrogatories 16 - 21 are premature in that they call for information that is properly the subject of expert testimony at a time, and in a manner, other than that called for by the scheduling order in this case. Any response that Plaintiff gives prior to the production of expert reports is subject to change by way of amendment and supplementation.

3. Plaintiff objects to Interrogatories 16 - 21, to the extent that they are premised upon an incorrect interpretation of law, to wit, that Plaintiff bears the burden of proving that its patented designs are novel. The issuance of a patent is prima facie evidence of the patented invention's novelty and Defendant bears the burden of overcoming this presumption by clear and convincing evidence.

4. Plaintiff objects to Interrogatories 16 - 21 to the extent that, in calling for the identification of "each point of novelty" rather than "the points of novelty" the interrogatories a) incorrectly presuppose that novelty cannot and/or does not reside in the combination of design elements (pre-existing or new) in a way that creates a novel ornamental design and/or b) incorrectly presuppose that points of novelty in a design protected by a design patent are equivalent to the limiting elements of a utility patent claim such that a party may avoid literal infringement by merely omitting or making an insubstantial change to an identified element.

5. Plaintiff's responses to interrogatories 16 - 21 are given subject to the limitation that each response should be read in conjunction with the patent drawings and that each cannot be, and should not be, read as supplanting or contradicting the claims of the patents as expressed in the drawings.

2

6.      When particular materials, such as glass or metal, are referenced in Plaintiff's

responses to interrogatories 16 - 21, such references are illustrative and exemplary only, and used

only to avoid awkward constructions such as "a frame made of wood or some similarly sturdy and

opaque material enclosing a door made of glass or some other transparent material." Any reference

to a particular material is not, and is not intended to be, a claim limitation.

## RESPONSES TO INTERROGATORIES

**Interrogatory 16.**      Identify and describe with particularity each point of novelty of United

States Design Patent No. D438,727 entitled "Buffet."

**RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff

responds as follows. The design elements that comprise the design protected by U.S. Design Patent

No. D438,727, and in whose particular expression and/or use in combination may be found the

points of novelty of said patented design, are as follows:

a)      An overhanging top having rounded corners on the front facing side and square

corners on the rearward facing side, a milled rounded edge that projects out slightly from the flat top

surface running along the front and side edges, and having the central half of the outward facing long

side thrusting slightly outward by means of concave projections, so as to echo and maintain the

degree of overhang over the breakfront of the center of the buffet.

b)      An original decorative acanthus leaf frieze running along the front and side top

outside edge of the buffet said frieze being framed between narrow strips of molding and further

being parallel to the buffet top and to the floor.

3

c)      Rounded pilasters perpendicular to the floor on each of the outside front corners of

the buffet.

d)      A break front which is echoed by a corresponding break in the overhanging top and

base molding.

e)      Four rectangular doors of approximately equal width on the front of the buffet, said

doors together covering nearly the entire front portion of the buffet between the decorative frieze and

the base molding, the two doors on the left hand side of the buffet being hinged on the left side and

the doors on the right hand side of the buffet being hinged on the right hand side, and further having

the inner two doors covering the majority of the break front between the frieze and the base molding.

f)      A characteristic design for each of the four above described doors in which an outer

frame molding on each door surrounds the particular decorative filagree design shown and depicted

in the '727 patent.

g)      A multi-stepped base molding on the front and sides of the buffet and touching or

appearing to touch, the floor throughout its length, projecting outward from the plane of the doors

and the side panels by approximately the same amount as the overhang of the top and similarly

echoing the outward projection of the breakfront.

h)      The use of common radii in the rounded front edge corners of the top, the pilasters,

on the frieze above the pilasters and on the base molding below the pilasters, and the common radii

of the concave projections that provide the outward thrust of the break front on the top, frieze, door

frames and base molding.

4

**Interrogatory 17.** Identify and describe with particularity each point of novelty of United States Design Patent No. D439,770 entitled "Dining Room Table."

**RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff responds as follows. The design elements that comprise the design protected by U.S. Design Patent No. D439,770, and in whose particular expression and/or use in combination may be found the points of novelty of said patented design, consist of the following:

a) A trestle table design in which the legs posts and stretchers are each rope-turnings having a relatively large cross-section or diameter in comparison to more usual table legs, each leg post having three and one half to four "twists" (depending on viewing angle), the turnings of each stretcher having the same number of "twists" per unit of length as the legs and the stretchers being of the same diameter as the leg posts.

b) Four end stretchers, each of which runs at an angle from a trestle base on each leg post to a trestle base at the end of a central stretcher so as to form a pair of opposing open "Y" shapes;

c) The foregoing trestle bases on each leg post appearing to connect and separate the rope turning above it to a bun foot below it, and the trestle bases at the ends of the central stretcher each also having a bun foot and,

d) the foregoing trestle bases on each leg post being the chamferred square of the turning with ring turnings above it and the trestle bases at the ends of the central stretcher being a roughly cubical square of the turning with molding on the top surface, and,

5

f)    The top of each leg post being a chamferred square of the turning of same diameter as the trestle base on the leg which connect four runners, in rectangular relation each to the other that forms, or appears to form, the base for the table top.

g)    A long four sided top that is roughly rectangular except that the two shorter edges at the ends of the table are a distinctive serpentine shape while the two long side edges are straight.

h)    A stepped undermolding running along the entire circumference of the tabletop.

i)    Clearly visible and distinct planking on the top surface of the table.

**Interrogatory 18.**    Identify and describe with particularity each point of novelty of United States Design Patent No. D439,763 entitled "Curio Cabinet"

**RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff responds as follows. The design elements that comprise the design protected by U.S. Design Patent No. D439,763, and in whose particular expression and/or use in combination may be found the points of novelty of said patented design, consist of the following.

a)    A curio cabinet having a round arched top that rests, or appears to rest, on crown molding that begins at the top of each pilaster and continues back horizontally across the sides of the cabinet.

b)    A distinctive decorative scroll-work frieze on the front top section along the curve of the arch.

c)    A distinctive decorative scroll-work frieze on the pilasters.

6

d)      Sides of wooden framed transparent glass that reach from the base molding to the crown molding at the bases of the arch, with straight muntin (or mullion) approximately one third of the way up from the bottom of the frame, and shelves made of transparent glass inside the cabinet.

e)      Two wooden framed transparent glass doors that extend from the curved decorative frieze on the arched top down to the base molding, each such door being a mirror image the other and each being hinged on the pilaster side of the cabinet so as to open outward, having straight bottoms and sides and a top curved so as to follow the curve of the arched top, with the front of the arched top immediately below the decorative frieze on the arch.

f)      Muntin (or mullion) about one third of the way up from the bottom of each of the two doors door that, together, forms a serpentine shape across the front of the cabinet.

g)      On each door, filagree (or latice) work, similar in design to that used on the doors of the buffet protected by the '727 patent, that extends from, and fills the area between, the bottom frame of the door up to the muntin.

h)      A base surrounded on the outer edge of the front and sides by stepped base molding that is wider at the bottom than the top (in pyramid fashion), rounded projections at each of the front facing bottom corners and the entire cabinet resting upon four intricately carved bun feet at each of the four bottom corners.

**Interrogatory 19.**      Identify and describe with particularity each point of novelty of United States Design Patent No. D441,560 entitled "Bed."

**RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff responds as follows. The design elements that comprise the design protected by U.S. Design Patent

No. D441,560, and in whose particular expression and/or use in combination may be found the points of novelty of said patented design, consist of the following.

      a)     A metal bed comprising a headboard and a footboard having intricately designed flat-bar metalwork designs, as shown in the patent and described in more detail herein.

      b)     A headboard having two long thin posts, each with a square cross-section, pineapple finials and turned scrolled urn-shaped feet, each post joined at its approximate midpoint by a rail, also with a square cross-section, that extends across with width of the headboard and joins the posts together in "H" fashion.

      b)     Two additional inner half-posts that rise from the rail of the headboard about a quarter of the way in from the outer posts so as to divide the head board into three sections, said inner half-posts extending above the top of the two outer rails, and each such inner half-posts having pineapple finials and a square cross-section of the same diameter as the outer posts.

      c)     Three pieces of flat bar metalwork on the headboard that attach each half-post to the adjacent post or half-post at points beginning slightly below the finials, the pieces joining the half-posts to the post consisting of a cove shape leading to a flat and the central piece being round arch-shaped.

      d)     Three additional pieces of flat bar metal work on the headboard, identical in shape to those described above, and placed a short distance below them such that all six pieces together create the form of a pediment, consisting of a cove rising to a flat rising to a round arch which then descends to a flat which descends to a cove, and which, by joining the posts and half posts, create three panels below the pediment.

e)      A circular decorative ornament on the headboard between the highest point of the two

halves of the above described arch, which ornament consists of two facing C-scrolls joined in their

center by a diamond.

f)      Intricate flat-bar metal scroll work of distinctive design on the headboard within each

of the three panels as more fully described herein and shown in the patent.

g)      Distinctive intricate flat-bar metal scroll work in each of the two outer panels of the

headboard comprising a series of interwoven S-scrolls, partial S-scrolls and  and C-scroll and the

scroll work in each of the outer panels being the mirror image of the metal work in the other outer

panel.

h)      Distinctive intricate flat-bar metal scroll work in the central panel of the headboard

featuring a central diamond shape, comprised of four smaller diamond shapes, a fleur-de-lis attached

to the top and bottom points of the central diamond, all surmounted by a series of S-scrolls, partial

S-scrolls and C-scrolls above and below the central diamond and fleur-de-lis shape, all in a design

in which the top and bottom halves are nearly mirror images except that the top half is surmounted

by a fleur-de-lis that rises up to the bottom of the arch of the pediment.

i)      A footboard having two end posts, each such end post having a square cross-section,

pineapple finials and urn-shaped turned scrolled feet, and each end post being similar to the end

posts on the headboard except in length.

j)      A rail having a square cross section of the same diameter as the end posts connecting

the two end posts of the footboard slightly above the feet.

k)      Two square cross-section inner posts dividing the footboard into three equal-sized

panels, each such inner panel being identical to the other two and each being surmounted by a piece

9

of curved flat-bar metal work that rises at its highest point almost to the level of the finials on the end post.

    l)    Each panel of the footboard comprising essentially identical intricate scroll work within an inner round arch (or tablet shape) connected to the top arch by an ornament comprised of two inward-facing C-scrolls surrounding a diamond (said ornaments being identical to that on the cental panel of the headboard) and connected to the adjoining posts by a horizontal flat-bar metal members.

    l)    Each of the three panels comprising intricate flat-bar metal scroll work. In this scroll work, a central diamond shape is divided into four smaller diamond shapes by two straight S-scrolls that, together form an X shape and each of which reaches to the edge of the inner arch. Above and below the central diamond are large horizontal C-scrolls whose ends curve inward to form the leaves of fleur-di-lis that grow out of the top and bottom points of the central diamond.

    **Interrogatory 20.**    Identify and describe with particularity each point of novelty of United States Design Patent No. D441,975 entitled "Dining Room Chair."

    **RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff responds as follows. The design elements that comprise the design protected by U.S. Design Patent No. D441,975, and in whose particular expression and/or use in combination may be found the points of novelty of said patented design, consist of the following.

    a)    A wooden framed dining room chair with an upholstered back and seat, as more fully described herein, having two embodiments, armed and unarmed.

b)     The back of each seat is set back at slightly more than a 90° degree angle from the

seat. The top of the back of the seat is the characteristic serpentine shape that is one of the unifying

elements of the Coronado collection and the front of the top bears an intricate acanthus leave

carving reminiscent of the frieze of the '727 buffet. The sides of the frame of the back are straight

and are a continuous piece with the rear legs.

c)     The front of the back is a padded upholstered cushion set within and surrounded by

the wooden frame. The sides and bottom of the cushion are straight while the top has the same

serpentine shape as the top of the frame. The cushion ends slightly above the seat. On the frame,

in the gap between the seat and the back is a double bead.

d)     The seat of the chair is a large plush upholstered cushion, slightly domed on top,

having straight sides and back and slightly rounded corners. The front of the cushion is serpentine

shaped.

e)     The legs are carved and scrolled in the Louis XIV style. Each front and rear leg is

joined by a serpentine side rail. The the two side rails are joined near the front of the chair by a

serpentine cross rail.

f)     In the armchair embodiment, the arms of the chair are also wood carved and scrolled

in the Louis XIV style. Each arm angles slightly out and downward from the frame of the back and

ends at about the level of the end of the seat cushion. In the front, each arm is connected to the seat

frame by a scrolled, somewhat serpentine, stile that angles back from the front of the seat and

attaches beneath the arm, slightly back of the curve of the scrolling on the front of the arm.

11

**Interrogatory 21.** Identify and describe with particularity each point of novelty of United States Design Patent No. D441,980 entitled "Bed."

**RESPONSE:** Subject to the general objections and limitations set forth herein, Plaintiff responds as follows. The design elements that comprise the design protected by U.S. Design Patent No. D441,980, and in whose particular expression and/or use in combination may be found the points of novelty of said patented design, consist of the following.

a) A serpentine shaped headboard surmounted by a serpentine cornice with ogee molding blending into a cove on the left and right most sides of the headboard.

b) Three recessed panels on the front of the headboard of equal width, each extending from near the bottom of the headboard to a point near the top. Each panel is framed by molding which projects outward from the plane of the headboard and the recessed edges are likewise molded. The top of each of the three panels is shaped such that, in combination, they follow the line of the serpentine shape of the headboard.

c) Two relatively massive turned end posts on either side of the headboard, each extending well above the cornice of the headboard. The top portion of each post, beginning at a point slightly below the cornice, is rope turned with a continuous series of carved acanthus leaves trailing around the grooves of the turning. The tops of the posts are intricately carved ovoid, or acorn shaped, finials. The finials are separated from the rope turnings by two ring turnings. The bottom length of the end posts have a chamferred square cross-section. The chamferred and rope-turned potions of the posts are separated by two ring turnings. At the bottom of each post is a rounded, somewhat urn-shaped, foot.

12

d)    A rectangular footboard joined by two end posts that are approximately equal in height to the end posts of the headboard as more fully described herein.

e)    The front of the footboard had molding along its top and bottom. The top and bottom molding extends outward so as to overhang the front and rear planes of the footboard. The rear of the footboard is unadorned and flat other than the overhang of the molding.

f)    On the front of the footboard, slightly above the bottom molding, on the front of the footboard is a carved bead. The front of the footboard had two rectangular recessed panels, each with its long edge horizontal. Each panel is framed by molding that extends outward from the plane of the footboard and the pattern of the molding continues inward into the recess in a similar fashion to the recessed panels on the headboard.

f)    The posts of the footboard have turned, somewhat urn-shaped, feet like those on the head board. Above each foot is a chamferred square section similar in cross-section to that on the posts on the headboard, but shorter, extending only slightly above the horizontal top of the footboard.    Above the chamferred square section is a rope-turned section having turnings and acanthus leaf carvings similar to those in the headboard posts. This rope-turned section is separated from the chamferred section by one small and one large ring turning. There is an urn-shaped turning that breaks the rope-carved section into two pieces of uneven length, approximately two-thirds to three quarters of the way up from the bottom of the rope-turned section. The footboard posts have the same type of finials as the headboard posts.

13

**Interrogatory 22.**     Identify by name, address, telephone number, and position the person in Plaintiff's employ most knowledgeable about Collezione's alleged infringement(s), and state when and where such person has seen Collezione's allegedly infringing products.

OBJECTION. Plaintiff objects to providing the address and phone number of its employees on the grounds that such information is not relevant and, in any case, cannot be used by Defendant's counsel under the Revised Rules of Professional Conduct of the North Carolina State Bar. Without waiving such objection, Plaintiff identifies Peter Craymer and Rountree Collett as being the persons in the employ of Plaintiff (or its licensee) believed most knowledgeable about Defendant's infringement.

**Interrogatory 23.**     State each and every factual basis of your Fourth Cause of Action, specifically including, but not limited to, your contention that Collezione is "manufacturing, importing and selling beds that are confusingly similar to the ornamental design protected by the 1560 [sic] Patent."

**ANSWER:**     Defendant objects to this interrogatory on the following grounds:

a)     The interrogatory is compound in that inquiries regarding the numerous factual allegations set forth in Plaintiff's Fourth Cause of Action should be made the subject of separate interrogatories.

b)     The interrogatory is overly broad in that there are numerous factual allegations in Plaintiff's Fourth Cause of Action such that it would be unduly burdensome to answer the interrogatory in the format requested.

14

c) Plaintiff assumes that the interrogatory's request for "each and every factual basis of [Plaintiff's] Fourth Cause of Action" does not apply to factual allegations incorporated into that cause by reference. To the extent that this was Defendant's intent, Plaintiff refuses to answer on grounds of over-breadth and undue burden.

d) Plaintiff objects to the request for "each and every factual basis" on grounds that discovery is ongoing and, accordingly, Plaintiff may not yet know every fact that may be material to this cause.

Without waiving such objections, and subject to them, Plaintiff responds as follows:

The substantive allegations of Plaintiff's fourth cause action are based upon the following facts. a) the issuance and/or contents of U.S. Design Patent D441,560 which is prima facie evidence of the existence, ownership and validity of the patent. b) Defendant's display and offering for sale a bed that literally infringes the '560 patent at the April and/or October, International Home Furnishings Markets in 2000. The infringing bed in question appears to have copied the patented design down to the smallest detail. Plaintiff has previously given Defendant photographs that were taken of this bed in Defendant's showroom space during the market. c) The well-known fact that Defendant has the furniture it sells manufactured overseas. d) The fact that the infringing bed is identical in every respect to the design protected by the '560 patent.

This the 19th day of August, 2002.

15

Norwood Robinson, N.C. State Bar No. 4959
Stephen Robinson, N.C. State Bar No. 18401

OF COUNSEL

ROBINSON & LAWING, L.L.P.
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103-1835
Telephone: (336) 631-8500
Facsimile: (336) 631-6999

16

## VERIFICATION

The undersigned Peter W. Craymer, as an officer and agent of Bernhardt LLC, certifies that, to the best of my knowledge and belief, the information contained in the foregoing answers to interrogatories is true and correct.

THIS the _19th_ day of August, 2002.

Peter W. Craymer

Sworn to and subscribed before me
this the _19th_ day of August, 2002

_Coral Bragg_
Notary Public

My commission expires: _11-11-06_

14

# CERTIFICATE OF SERVICE

I, Stephen Robinson, certify that I served the foregoing **Plaintiff's Response to Defendant's**

**Second Set of Interrogatories** upon counsel of record by hand delivering same to:

> Peter J. Juran, Esq.
> Blanco Tackabery Combs & Matamoros, P.A.
> Stratford Point Building, 5th Floor
> 110 S. Stratford Road
> Winston-Salem, NC 27104-4229

and by mailing a copy, first class postage prepaid, to:

> Nicholas Mesiti
> Heslin Rothenberg Farley & Mesiti P.C.
> 5 Columbia Circle
> Albany, New York 12203

This the 19th day of August, 2002.

Stephen Robinson

ATTACHMENT/EXHIBIT
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

Civil Action No. 1:01CV00957

BERNHARDT, L.L.C.,           )
                             )
              Plaintiff,     )
                             )
      vs.                    )
                             )                COPY
COLLEZIONE EUROPA, USA,      )
INC.,                        )
                             )
              Defendant.     )

---

## DEPOSITION

## OF

## DOUGLAS SCOTT COLEY

---

Winston-Salem, North Carolina
October 28, 2002
9:03 a.m.

Court Reporter:  Connie B. Ritch

**LEGAL REPORTING SERVICES (336) 884-1315**

# TABLE OF CONTENTS

                                                              PAGE

EXHIBIT INDEX . . . . . . . . . . . . . . . . . .    3

APPEARANCES . . . . . . . . . . . . . . . . . . .    6

STIPULATIONS  . . . . . . . . . . . . . . . . . .    7

EXAMINATION

        By Mr. Hutton . . . . . . . . . . . . . .    8

        By Mr. Robinson . . . . . . . . . . .    145

CERTIFICATE OF REPORTER . . . . . . . . . . . .    150

CERTIFICATE OF WITNESS  . . . . . . . . . . . .    151

ERRATA SHEET  . . . . . . . . . . . . . . . . .    152

Reporter's Note:  This transcript contains quoted material.  Such material is reproduced as read or quoted by the speaker.

# EXHIBIT INDEX

DEFENDANT'S                                                    PAGE

Number 1     Subpoena and Notice  . . . . . . . . .   9

Number 2     Royalty Agreement, Bates-numbered
             B-00681 to B-00683 . . . . . . . . . .  24

Number 3     U.S. Design Patent 441,980S,
             Bates-numbered B-00002 through
             B-00008  . . . . . . . . . . . . . . .  29

Number 4     Plate 166, Bates-numbered B-00400  . .  35

Number 5     U.S. Design Patent 438,727S,
             Bates-numbered 00285 through 00288 . .  53

Number 6     Buffet Sketch, Bates-numbered B-01053   55

Number 7     U.S. Design Patent 412,413, Bates-
             numbered B-00309 through B-00314 . . .  60

Number 8     Buffet Sketch, Bates-numbered B-00811   63

Number 9     Dressing Chest Sketch, Bates-numbered
             B-00699  . . . . . . . . . . . . . . .  64

Number 10    U.S. Design Patent 448,947S  . . . . .  65

Number 11    U.S. Design Patent 441,975S,
             Bates-numbered B-00417 to B-00422  . .  79

Number 12    Arm Chair Sketch, Bates-numbered
             B-01116  . . . . . . . . . . . . . . .  81

Number 13    Arm Chair Sketch, Bates-numbered
             B-00644  . . . . . . . . . . . . . . .  82

EXHIBIT INDEX (CONTINUING)

PAGE

Number 14    Arm Chair Sketch, Bates-numbered

             B-01068 . . . . . . . . . . . . . . . 89

Number 15    Thomasville Furniture Founders

             Brochures . . . . . . . . . . . . . 92

Number 16    U.S. Design Patent 439,770S,

             Bates-numbered B-00364 through

             B-00366 . . . . . . . . . . . . . . 95

Number 17    Dining Table Sketch, Bates-numbered

             B-01071 . . . . . . . . . . . . . . 96

Number 18    Page 303, Dictionary of Furniture,

             Bates-numbered B-00407 . . . . . . . 103

Number 19    Photograph of Table, Bates-numbered

             B-00651 . . . . . . . . . . . . . . 106

Number 20    U.S. Design Patent 439,763S,

             Bates-numbered B-00135 to B-00138 . 116

Number 21    Metal Curio Sketch, Bates-numbered

             B-01073 . . . . . . . . . . . . . . 117

Number 22    Jigsaw Wood Door Screens, Bates-

             numbered B-00600 . . . . . . . . . . 118

Number 23    U.S. Design Patent 448,204S . . . . 122

Number 24    U.S. Design Patent 425,329 . . . . . 127

Number 25    Alonzi Brochure . . . . . . . . . 128

EXHIBIT INDEX (CONTINUING)

                                                     PAGE

Number 26    U.S. Design Patent 441,560S, Bates-

             numbered B-00187 through B-00193  . .  132

Number 27    Declaration, Bates-numbered 00541

             to 00542 . . . . . . . . . . . . . .  137

Number 28    Artifacts International Brochure  . .  143

Reporter's Note:  Exhibits 1-28 Retained by Counsel

for Defendant.

APPEARANCES

APPEARING ON BEHALF OF THE PLAINTIFF:

    Robinson & Lawing, by

    Stephen Robinson, Esq.

    370 Knollwood Street, Suite 600

    Winston-Salem, North Carolina  27103

    - and -

    Jason M. Hensley, Esq.

    Bernhardt Furniture Company

    1839 Morganton Boulevard

    Post Office Box 740

    Lenoir, North Carolina  28645-0740

APPEARING ON BEHALF OF THE DEFENDANT:

    Heslin Rothenberg Farley & Mesiti, P.C., by

    Brett M. Hutton, Esq.

    5 Columbia Circle

    Albany, New York  12203

    - and -

    Blanco Tackabery Combs & Matamoros, P.A., by

    Peter J. Juran, Esq.

    110 South Stratford Road

    Post Office Drawer 25008

    Winston-Salem, North Carolina  27114-5008

## STIPULATIONS

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record, as follows:

1.    The deposition of DOUGLAS SCOTT COLEY may be taken on Monday, October 28, 2002, beginning at 9:03 a.m., in the offices of Blanco Tackabery Combs & Matamoros, P.A.; 110 South Stratford Road, Fifth Floor; Winston-Salem, North Carolina, before Connie B. Ritch, Court Reporter and Notary Public.

2.    Said deposition shall be taken in accordance with the Federal Rules of Civil Procedure.

3.    The sealed original of this deposition will be mailed first-class postage or hand delivered to Brett M. Hutton, Esq.; Heslin Rothenberg Farley & Mesiti, P.C.; 5 Columbia Circle; Albany, New York, 12203; and notice of filing is hereby waived.

4.    The reading and signing of the deposition are not waived.

*********

Thereupon:

DOUGLAS SCOTT COLEY

being first duly sworn in the above cause, was examined and testified under oath as follows:

<u>EXAMINATION BY MR. HUTTON</u>

1

2      Q.   Could you state your name for the record,

3  please?

4      A.   Douglas Scott Coley.

5      Q.   And where do you live?

6      A.   Morganton, North Carolina.

7      Q.   Are you represented by counsel today?

8      A.   Yes, I am.

9      Q.   And who is that?

10     A.   Steve Robinson.

11     Q.   Are you aware that he's the same counsel

12  that represents Bernhardt in this case?

13     A.   Yes, I do.

14     Q.   Are you familiar with this case?

15     A.   Yes.

16     Q.   Have you ever been deposed before?

17     A.   No, I haven't.

18     Q.   Okay.  What's going to happen, I'm just

19  going to ask you a series of questions, and I just

20  expect you to answer the questions.

21          If you need a break at any time, just let

22  me know; we can take a break.  The only thing I ask

23  is, if I ask you a question, answer the question

24  before the break, simple as that.

25          So you're aware that this patent case

1    twisted column that was an architectural column, and

2    it had carving detail that we liked.  And we

3    referenced a late Seventeenth Century Portuguese bed

4    as that type of post.

5        Q.   So that specific type of post, what do

6    you mean by that specific post?

7        A.   The bed post in our design.

8        Q.   And what is the bed -- how would you

9    describe the bed post in your design, looking at U.S.

10   design patent 441,980, in general words?

11       A.   I'd say twisted, carved post -- high

12   post.

13       Q.   Now, a twisted portion of the bed you

14   found in your reference material?  Let me make it

15   easier.

16       A.   Yeah.  I'm sorry.

17            (THEREUPON, THE DOCUMENT HEREINAFTER

18   REFERRED TO WAS MARKED FOR IDENTIFICATION AS

19   DEFENDANT'S EXHIBIT NUMBER 4.)

20       Q.   I'm going to place before you Bernhardt's

21   produced document 00400.  Could you put that in front

22   of you?

23       A.   Uh-huh.

24       Q.   Do you recognize this document?

25       A.   Yes, I do.

1     Q.   Is this the Portuguese bed that you used

2   as a reference to design the bed in the 980 patent?

3     A.   This helped to inspire us.

4     Q.   Helped to inspire it.  So in Defendant's

5   Exhibit Number 4, there is a series of features for a

6   particular bed; is that correct?

7     A.   I'm not -- I don't understand "features."

8   Could you define that?

9     Q.   Individual features that make up the bed.

10  Like, for example, you said that a post -- consider a

11  post as a feature.  In Defendant's Exhibit Number 4,

12  are there various features for a post?

13    A.   We found inspiration in features of that

14  bed.

15    Q.   So, looking at the post that's -- the

16  post of the bed--- Let's just take the bed that's in

17  the upper right-hand corner of Defendant's Exhibit

18  Number 4.  Taking one of the foot bed posts, it has a

19  twisted -- twisted post.  Is that what you meant by a

20  twisted post?

21    A.   Yes.

22    Q.   This gave you the inspiration to put a

23  twisted post on the bed that's shown in the 980

24  design patent?

25    A.   It was one of the inspirations for that.

1       Q.   We'll take specific---  Now, before, you

2   said that a twisted post for a bed was not new; is

3   that correct?

4       A.   I didn't say that.

5       Q.   You said that---  Is a twisted post --

6   any type of twisted post used for a bed, has that

7   been done before?

8       A.   Yes.

9       Q.   The twisted post that's shown in the 980

10  patent, is that new?

11      A.   Yes.

12      Q.   What makes it new?

13      A.   Its application and the detail.

14      Q.   When you say "detail," what do you mean

15  by "detail"?

16      A.   The configuration of the carving in the

17  post, the type of turning.

18      Q.   So, for example, the carving -- describe

19  the carving for me, please.

20      A.   That's a hard question, because the whole

21  post is carved.

22      Q.   The whole post is carved?

23      A.   Yes.

24      Q.   When you say that the post was twisted,

25  can we call the space between the major twisted

portions a groove? Is that fair, just for discussion
purposes?

    A.    Yeah. I don't particularly like the
terminology.

    Q.    What would you call the space between the
twisting?

    A.    I don't know.

    Q.    Could we call it a groove?

    A.    Sure.

    Q.    Okay. Is there a specific carving within
that groove?

    A.    Yes.

    Q.    Do you consider that carving new?

    A.    Yes.

    Q.    Have you ever seen a post that had a
carving like that before?

    A.    Not exactly like that.

    Q.    Have you seen any posts that have had a
carving within the groove?

    A.    Yes.

    Q.    But it's not like this?

    A.    Correct.

    Q.    Where did you see the carving within the
groove?

    A.    In an architectural column that we had

A.    I worked -- I personally worked on that

finial, but I know it was collaborative, again, but I

did draw the finial.

Q.    A finial on top of -- have you ever seen

a finial on top of bed posts before?

A.    Yes.

Q.    In the past -- in past beds?

A.    Yes.

Q.    Is it common to put a finial on top of a

bed post in this type of bed post?

MR. ROBINSON:  Object to the form.

Q.    (By Mr. Hutton)  Is a finial on top of a

post a common design element that you use when you

design beds?

A.    Yes.  Just the---

Q.    The specific finial that's shown in

Figure 2, have you ever seen that finial before in

prior---

A.    No.

Q.    ---designs?

So you consider this finial new?

A.    Yes.

Q.    What's new about it?

A.    Its detail.

Q.    What type of details on this finial?

1    A.    Only on this Exhibit 4.

2    Q.    Okay.  Now, taking a look at Defendant's

3 Exhibit 4, the picture that's in the upper left-hand

4 corner---

5    A.    Uh-huh.

6    Q.    ---is that what you consider a turning

7 also?

8    A.    I would.

9    Q.    Okay.  Now, comparing that to the turning

10 used in the bed in the 980 patent, which is

11 Defendant's Exhibit 3, are those two turnings

12 similar?

13    A.    As a designer, I see them as different,

14 but they---

15    Q.    Are there noticeable differences between

16 the two?

17    A.    Yes.

18    Q.    Okay.  So looking at Defendant's Exhibit

19 Number 4, would you consider the general concept of a

20 turning on a bed post as a common design that's been

21 done in the past?

22         MR. ROBINSON:  Object to the form.

23    A.    I'm not comfortable with the word

24 "common."

25    Q.    (By Mr. Hutton)  A turning has been done

1  in the past on bed posts; is that correct?

2          A.    That's correct.

3          Q.    Okay.  Before, you said you were involved

4  with the production of samples -- well, involved with

5  looking at samples after they are made of designs

6  that you designed; is that correct?

7               MR. ROBINSON:  Object to the form.

8          A.    Would you restate your question?

9          Q.    (By Mr. Hutton)  I'll rephrase it.

10              Were you involved in looking at the

11 production sample of the bed that's shown in the 980

12 patent?

13         A.    I'm not sure of the word "production."

14 That makes me not---  I mean, it wasn't production.

15         Q.    Did Bernhardt like the design drawing of

16 the bed that's shown in 980 patent?

17         A.    Did they like it?

18         Q.    Did they like it?

19         A.    I can't recall.

20         Q.    Did they make the bed?

21         A.    Yes.

22         Q.    So you assume they liked it?

23         A.    I would assume.

24         Q.    Okay.  Now, after they made it, did you

25 have a chance to look at the bed?

1       A.    No.

2       Q.    It has an undermolding?

3       A.    Undertop frame.

4             (THEREUPON, THE DOCUMENT HEREINAFTER

5    REFERRED TO WAS MARKED FOR IDENTIFICATION AS

6    DEFENDANT'S EXHIBIT NUMBER 10.)

7       Q.    I am going to place before you what I

8    have marked as Defendant's Exhibit Number 10.  Do you

9    recognize this document?

10      A.    Yes.

11      Q.    What is it?

12      A.    U.S. design patent number 448,947S.

13      Q.    What's shown on this document?

14      A.    A bed.

15      Q.    Did you design this bed?

16      A.    Our office designed this bed, yes.

17      Q.    On the first page of Defendant's Exhibit

18   Number 10, you're listed as one of the inventors.  Do

19   you believe you're an inventor of this bed?

20      A.    Yes.

21      Q.    So you designed some of the features of

22   this bed; is that correct?

23      A.    Yes.

24      Q.    Now, there is a -- looking at Figure 1 of

25   Defendant's Exhibit--- No, let's look at Figure 2.

1  I'm sorry.  That would be the best one, Figure 2 of

2  Defendant's Exhibit Number 10.

3      A.   Yes.

4      Q.   Do you see the canopy portion of the bed?

5      A.   Yes.

6      Q.   Now, there's a -- would you call that a

7  frieze?

8      A.   Yes.

9      Q.   Okay.  Did you design that frieze?

10     A.   I can't recall.

11     Q.   Now, looking at that frieze and looking

12  at the -- that's shown in Figure 2 of Defendant's

13  Exhibit Number 10 and Figure 1 of the 727 patent,

14  which is the buffet that you designed, do you

15  consider -- are those two frieze the same?

16     A.   The curvy lines aren't the same in them.

17     Q.   Does the frieze in Figure 2 of

18  Defendant's Exhibit Number 10 have curvy lines?

19     A.   Yes.

20     Q.   Are there noticeable differences between

21  the frieze that's shown in Figure 2 of Defendant's

22  Exhibit Number 10 and the frieze that's shown on the

23  buffet in Figure 1 of the 727 patent?

24     A.   As a designer, I see differences in the

25  curvy lines.

the 727 patent, which is Defendant's Exhibit

Number 5, when you designed a buffet, did you take

into account whether the buffet is going to show

doors and drawers?

     A.   Not particularly.

     Q.   Well, why did you put the drawers in --

why did you show the drawers in Defendant's Exhibit

Number 8?

     A.   Aesthetics.

     Q.   So you wanted to get a particular look

with the drawers?

     A.   That would be correct.

     Q.   Okay.  And when you put four doors --

when you designed the buffet shown in Figure 3 of

the 727 patent, you wanted the buffet to look like it

had four doors; is that correct?

     A.   Not particularly.  The--- I don't know

how to answer that.  I'm sorry.

     Q.   Well, you've previously testified that

Figure 3 has four doors; is that correct?

     A.   That is correct.

     Q.   Okay.  And when you designed that, you

wanted it to look like it had four doors; is that

correct?

     A.   I would assume that's what I did at the

1      A.   As a designer, I can see differences.

2      Q.   Do you consider the leg new?

3      A.   Yes.

4      Q.   Okay.  Now, attached to the legs is what

5  I'll call a stretcher.  If you want to call it

6  something different, we can.

7      A.   Okay.

8      Q.   There's a stretcher.  Did you design that

9  stretcher?

10      A.   Our office designed that stretcher.

11      Q.   Do you consider that stretcher new?

12      A.   Yes.

13      Q.   So you've never seen that stretcher

14  before?

15      A.   Never?

16      Q.   Before you designed the chair, you've

17  never seen that stretcher before?

18      A.   Not that particular stretcher.

19      Q.   Now, let's just keep going up.  The arms,

20  did you design the arm?

21      A.   Our office designed the arm.

22      Q.   Do you consider that arm new?

23      A.   Yes.

24      Q.   Have you ever seen that arm before?

25      A.   Not that exact arm.

Q.   Can't recall.  Do you know if there would

be a record of any changes that were made during your

meeting -- or during your review of the prototype?

A.   The only record that I know of would be

if we changed drawings, and there would be a new date

that Bernhardt would have on this, on our details.

Q.   Do you know if Bernhardt took notes while

you recommended changes?

A.   I don't know.  I can't recall.

Q.   Do you recall who at Bernhardt looked at

the prototypes with you?

A.   I can't recall.

Q.   Was Mr. McDaniel there with you when you

reviewed the prototype?

A.   Possibly.

(THEREUPON, THE DOCUMENT HEREINAFTER

REFERRED TO WAS MARKED FOR IDENTIFICATION AS

DEFENDANT'S EXHIBIT NUMBER 15.)

Q.   I'm going to place in front of you what I

have marked as Defendant's Exhibit Number 15 and ask

you to take a look at that.  Have you ever seen this

document before -- or this set of documents before?

A.   I don't recall this.  It could have been

in the pictures that I mentioned when I met with

Steve last week.

1      Q.   So, in preparing for the deposition, you

2  may have---

3      A.   I might have seen it.

4      Q.   ---seen this?

5           Okay.  Looking at the third page, there's

6  four chairs shown in here, and directing you

7  specifically to the carving along the top of the back

8  of each of the chairs---

9      A.   Yes.

10      Q.   ---is that carving the same as the

11  carving shown on the top back of the chairs shown in

12  Figure 1 of the 975 patent in Defendant's Exhibit

13  Number 11?

14      A.   Under Number 1, is it?

15      Q.   Correct.

16      A.   As a designer, I would say they're

17  different.

18      Q.   So there's---  In your opinion, is there

19  noticeable differences between these two carvings?

20      A.   In my opinion, yes.

21      Q.   As a designer, is it typical to put a

22  carving along the top back portion of a chair?

23      A.   It's not typical, but it's not---

24      Q.   I'm not talking a specific one; any

25  carving.

1    left-hand side of the sketch.

2          Q.    Looking back at Defendant's Exhibit

3    Number 23, the base of -- does the base of Figure --

4    does the base of the armoire shown in Figure 1 look

5    the same as the base of the cabinet shown in Figure 1

6    of the 763 patent?

7          A.    It does not look the same.

8          Q.    Does not look the same?  What's the

9    differences?

10         A.    Number of lines and the projection, I

11   guess, out.

12         Q.    What do you mean by "projection out"?

13         A.    You earlier stated that in our 763 patent

14   that it appeared to move out away from the---

15         Q.    So the base in Figure 1 of the 204

16   patent, which is Defendant's Exhibit Number 23,

17   doesn't appear to go outwardly?

18         A.    Not as much.

19         Q.    Looking at the Figure 1 of the 763

20   patent, it appears to have four bun feet.  Do you

21   consider the bun feet new?

22         A.    Yes.

23         Q.    Have you ever used bun feet on furniture

24   before?

25         A.    Yes.

1   they the same?

2          A.   They're not the same.

3          Q.   Are there noticeable differences?

4          A.   There are noticeable differences.

5               (THEREUPON, THE DOCUMENT HEREINAFTER

6   REFERRED TO WAS MARKED FOR IDENTIFICATION AS

7   DEFENDANT'S EXHIBIT NUMBER 25.)

8          Q.   I'm going to place before you what I have

9   marked as Defendant's Exhibit Number 25 and ask you

10  whether you recognize this document?

11         A.   Yes.  I saw it over with Steve last week.

12         Q.   Okay.  Turning to page 3---

13              MR. ROBINSON:  Forgive me, Counsel.  What

14  did we mark this one?

15              MR. HUTTON:  Twenty-five.

16              MR. ROBINSON:  Thank you.

17         Q.   (By Mr. Hutton)  The cocktail table

18  that's shown in the top right-hand corner of

19  Defendant's Exhibit Number 25, does that have bun

20  feet?  Would you consider those bun feet?

21         A.   I would consider it a bun foot, yes.

22         Q.   Okay.  Comparing those bun feet with the

23  bun feet shown in Figure 1 of U.S. design -- of

24  the 763 patent, are there noticeable differences

25  between those bun feet?

Case 1:01-cv-00957-JAB   Document 71   Filed 01/15/03   Page 45 of 69

1       A.   As a designer, I see noticeable

2   differences.

3       Q.   Looking back at the 763 patent, which is

4   Defendant's Exhibit Number 20, looking at Figure 2,

5   does it appear that this cabinet has shelves inside

6   the cabinet?

7       A.   I would assume that it has shelves inside

8   this cabinet.

9       Q.   How many shelves does it appear to have?

10      A.   There are horizontal lines that I'm

11  making an assumption are shelves, and there are, one,

12  two, three -- five of those.

13      Q.   The top shelf, where is -- which one are

14  you considering the top shelf?

15      A.   As far as from the top of the cabinet?

16      Q.   From the top of the cabinet.

17      A.   Right here (indicating).

18      Q.   Okay.  The door -- the portion of the

19  doors of the cabinet that extend into the arc

20  portion, do those cover the area in front of the top

21  shelf?

22      A.   Could you explain that again?

23      Q.   Sure.  If you were to put something on

24  the top shelf---

25      A.   Okay.

ATTACHMENT/EXHIBIT_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

Civil Action No. 1:01CV00957

BERNHARDT, L.L.C.,            )
                             )
            Plaintiff,       )
                             )
      vs.                    )
                             )
COLLEZIONE EUROPA, USA,      )
INC.,                        )
                             )
            Defendant.       )

COPY

---

## DEPOSITION

## OF

## THOMAS MORRIS McDANIEL

---

Winston-Salem, North Carolina
October 28, 2002
1:46 p.m.

Court Reporter:  Connie B. Ritch

**LEGAL REPORTING SERVICES (336) 884-1315**

1                          <u>TABLE OF CONTENTS</u>

2                                                         <u>PAGE</u>

3    EXHIBIT INDEX . . . . . . . . . . . . . . . . . .   3

4    APPEARANCES . . . . . . . . . . . . . . . . . . .   4

5    STIPULATIONS  . . . . . . . . . . . . . . . . . .   5

6    EXAMINATION

7          By Mr. Hutton . . . . . . . . . . . . . .   6

8    CERTIFICATE OF REPORTER . . . . . . . . . . . .  96

9    CERTIFICATE OF WITNESS  . . . . . . . . . . . .  97

10   ERRATA SHEET  . . . . . . . . . . . . . . . . .  98

11

12

13

14

15

16

17

18

19

20

21

22

23   Reporter's Note:  This transcript contains quoted

24   material.  Such material is reproduced as read or

25   quoted by the speaker.

1              <u>EXHIBIT INDEX</u>

2    <u>DEFENDANT'S</u>                                          <u>PAGE</u>

3    Number 29    Subpoena and Notice   . . . . . . . . . 7

4    Number 30    Detail Revision Labels . . . . . . . . 94

5

6

7

8

9

10   Reporter's Note:  Exhibits 29 and 30 Retained by

11   Counsel for Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>APPEARANCES</u>

APPEARING ON BEHALF OF THE PLAINTIFF:

         Robinson & Lawing, by

         Stephen Robinson, Esq.

         370 Knollwood Street, Suite 600

         Winston-Salem, North Carolina   27103

         - and -

         Jason M. Hensley, Esq.

         Bernhardt Furniture Company

         1839 Morganton Boulevard

         Post Office Box 740

         Lenoir, North Carolina   28645-0740

APPEARING ON BEHALF OF THE DEFENDANT:

         Heslin Rothenberg Farley & Mesiti, P.C., by

         Brett M. Hutton, Esq.

         5 Columbia Circle

         Albany, New York   12203

         - and -

         Blanco Tackabery Combs & Matamoros, P.A., by

         Peter J. Juran, Esq.

         110 South Stratford Road

         Post Office Drawer 25008

         Winston-Salem, North Carolina   27114-5008

<u>STIPULATIONS</u>

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record, as follows:

     1.   The deposition of THOMAS MORRIS McDANIEL may be taken on Monday, October 28, 2002, beginning at 1:46 p.m., in the offices of Blanco Tackabery Combs & Matamoros, P.A.; 110 South Stratford Road, Fifth Floor; Winston-Salem, North Carolina, before Connie B. Ritch, Court Reporter and Notary Public.

     2.   Said deposition shall be taken in accordance with the Federal Rules of Civil Procedure.

     3.   The sealed original of this deposition will be mailed first-class postage or hand delivered to Brett M. Hutton, Esq.; Heslin Rothenberg Farley & Mesiti, P.C.; 5 Columbia Circle; Albany, New York, 12203; and notice of filing is hereby waived.

     4.   The reading and signing of the deposition are not waived.

             *********

Thereupon:

          THOMAS MORRIS McDANIEL

being first duly sworn in the above cause, was examined and testified under oath as follows:

Case 1:01-cv-00957-JAB   Document 71   Filed 01/15/03   Page 52 of 69

<u>EXAMINATION BY MR. HUTTON</u>

Q.   Would you state your name for the record, please?

A.   Thomas Morris McDaniel.

Q.   And your address, please?

A.   221 Riverside Drive.

Q.   Is that in North Carolina?

A.   That's in Morganton---

Q.   North Carolina.

A.   ---North Carolina.

Q.   Okay.  Have you ever been deposed before?

A.   Pardon?

Q.   Have you ever been deposed before?

A.   First time.

Q.   This is the first time?

A.   This is my first time.

Q.   Okay.  What's going to happen is, I'm going to ask you a series of questions, which I expect you to answer.  If at any time you need a break, just let me know, and we'll take a break.  That goes with anyone, too.

The only thing I ask is, if I ask you a question, to answer the question before we take the break.  Okay?

A.   (Nods head up and down.)

1         A.     You're saying these two right here

2  (indicating)?

3         Q.     Yes.

4         A.     They are not the same.

5         Q.     Are they pretty different?

6         MR. ROBINSON:   Object to the form.

7         A.     They are different.

8         Q.     (By Mr. Hutton)   Are they substantially

9  different?

10        A.     Very different.

11        Q.     Okay.   I'm going to show you -- put in

12  front of you what we've previously marked as

13  Defendant's Exhibit Number 10 and have you take a

14  look at that.   Do you recognize this?

15        A.     This right here (indicating)?

16        Q.     Yes.

17        A.     Yes, I do.

18        Q.     And what is it?

19        A.     That is a design patent of a poster bed

20  with canopy.

21        Q.     Okay.   Are you listed as an inventor of

22  this patent?

23        A.     I'm sorry?

24        Q.     Did you design this bed?

25        A.     Scott and I designed it.

1          Q.   Okay.  So you're listed as an inventor on

2    the face of the patent; is that correct?

3          A.   Yes.

4          Q.   I want you to take a look at the canopy.

5    And there's a design on the outside surface of the

6    canopy.  Do you see that?

7          A.   Up here (indicating)?

8          Q.   Yes.

9          A.   Yes, I see that.

10         Q.   Okay.  And if you compared that design

11    with the frieze below the top of the 727 patent, the

12    buffet, this one, is that frieze---

13         A.   Is this the 727?

14         Q.   Yeah.  Correct.  Are they the same?

15         A.   These are different.

16         Q.   Are they substantially different?

17         A.   They're different.

18         Q.   So, from my understanding, the carving on

19    the top of the canopy is substantially different than

20    the frieze?

21              MR. ROBINSON:  Object to the form.

22         Q.   (By Mr. Hutton)  Are they noticeably

23    different?

24         A.   They're different.

25         Q.   Okay.  Turning back to Defendant's

Exhibit Number 9--- You can get rid of the two next

to you -- the two patents next to you. Let's just

take these two.

     A.   Which one is Number 9?

     Q.   Defendant's Exhibit Number 9 and

Defendant's Exhibit Number 5, if you'll put those two

in front of you. There you go. Do you see any

differences between the buffet shown in Defendant's

Exhibit Number 5 and the dresser chest shown in

Defendant's Exhibit Number 9?

     A.   The difference is one is a four-door

buffet, and the other one is a

two-door-with-four-drawers buffet -- dressing

chest. I'm sorry.

     Q.   Do the drawers make the dresser chest

look different than the buffet shown in the 727

patent?

     A.   They're different because they have four

drawers, and the other one has four doors.

     Q.   Do four doors -- do four drawers look

different than two doors, in your opinion?

     A.   Well, they're different because four door

and two drawer. They're different.

     Q.   They're different.

     Okay. Did you do the engineering

drawings for the buffet shown in the 727 patent?

A. I don't recall. I'd have to look at my document and find out.

Q. Do you know what's behind the doors in the buffet?

A. On the 727?

Q. On the 727 patent.

A. Normally -- I don't recall, but normally there's usually adjustable shelf or tray drawers.

Q. Tray drawers? What are tray drawers?

A. Or adjustable shelf. They're drawers behind a door that pull out.

Q. Why---

A. I don't recall on this. Normally that's what they do design. But I'd have to go look at my documents to find out what -- in this exact piece.

Q. Okay. Why would you put a door over a pull-out drawer or a tray drawer?

A. Just being stylistic, you know.

Q. For style?

A. Yeah. Style.

Q. For design purposes?

A. Design.

Q. It makes it look different if you have a door over the pull-out drawer?

Case 1:01-cv-00957-JAB   Document 71   Filed 01/15/03   Page 57 of 69

1          A.   Well, it's just another way of

2     approaching a design.

3          Q.   Okay.  But you would consider -- if you

4     had a door and a drawer, would it be different than a

5     door that covers the whole thing?

6               MR. ROBINSON:  Object to the form.

7          Q.   (By Mr. Hutton)  You can answer, if you

8     can.

9          A.   I lost your question.  I'm sorry.

10          Q.   Excuse me?

11          A.   I lost your question.

12               MR. HUTTON:  Thanks, Counsel.

13          Q.   (By Mr. Hutton)  Let's take a look at---

14     Well, I'll show you Defendant's Exhibit Number 8,

15     right here, this one.  Do you recognize this?

16          A.   It's been a while.

17          Q.   Do you recognize it?

18          A.   Yeah.  I recognize my name and the

19     picture and everything, yes.

20          Q.   What is it?

21          A.   It's a buffet.

22          Q.   Okay.  Now, the buffet that's shown in

23     Defendant's Exhibit Number 8, is that different than

24     the buffet shown in Defendant's Exhibit Number 5?

25          A.   Number 5 has four doors.  Number 8 has

Case 1:01-cv-00957-JAB   Document 71   Filed 01/15/03   Page 58 of 69

1   that specific stretcher?

2        A.   It's hard to tell.  I mean, I don't know.

3   Somebody could have done one earlier, but I don't

4   recall.  But this is new to us.

5        Q.   Have you ever seen a stretcher like that

6   specific stretcher before?

7        A.   I've seen similarities.

8        Q.   Similarities.  But how about that -- is

9   it identical to what you've done before?

10       A.   I don't know.  I'm not sure.  Hard to

11  tell.

12       Q.   How about the arms; have you ever seen

13  those arms before?  Do you consider--- Have you ever

14  seen those arms before?

15       A.   Are you talking about in general, or are

16  you talking about the specific details in this

17  drawing?

18       Q.   The specific details in the drawing, do

19  you consider that specific arm shown in Figure 1 of

20  the 975 patent as new?

21       A.   This is new.

22       Q.   How about the -- there's a carving on the

23  top of the back of the chair.  Do you consider that

24  specific carving as new?

25       A.   Yeah.  We put that carving on there.

1  issued.  I didn't know that -- I know that it's in

2  process.  I didn't know when it was approved.

3      Q.   So you didn't get any prewarning -- you

4  personally didn't get any prewarning?

5      A.   I didn't get any, but I knew they were

6  patenting it.

7      Q.   For any of the designs that patent

8  applications were filed -- any of your designs that

9  patent applications are filed, do you have any

10 conversations with Bernhardt regarding those

11 applications after they're filed?

12     A.   No.

13     Q.   Okay.  I'm going to put in front of you

14 what we've previously marked as Defendant's Exhibit

15 Number 15 and tell you to take a look at that,

16 please, and ask you whether you recognize it or not?

17     A.   I do not recognize this.

18     Q.   You've never seen this before?

19     A.   I don't recall.

20     Q.   Looking at Figure 1 of the 975 patent

21 that's marked as Defendant's Exhibit Number 11---

22 Please look at Figure 1.

23     A.   Figure 1.

24     Q.   The carving along the top back portion of

25 the chair -- of the patent---

1          A.    This right here (indicating)?

2          Q.    Yeah.   Of the patent, please.

3          A.    Oh, the patent.   Right here, yeah.

4          Q.    Is that the same carving that appears on

5     the back of the chairs shown on the third page of

6     Defendant's Exhibit Number 15?

7          A.    This is what you're referring to

8     (indicating)?

9          Q.    (Nods head up and down.)

10         A.    It's not -- it's not the same carving.

11         Q.    No?   Is it -- is it different?

12         A.    It is different.

13         Q.    Taking a look at the carving on the top

14    of the -- or along the outside of the canopy in

15    Defendant's Exhibit Number 10---

16         A.    Up here (indicating)?

17         Q.    Yeah.

18               ---is that carving the same as the

19    carving on the back of the chair shown in the 975

20    patent?

21         A.    On the back of the chair?

22         Q.    On the back of the chair.   The same

23    carving that we've been talking about before.   If you

24    want to look at Figure 2, that's fine, too.

25         A.    I don't see anything on the back of the

1     chair.

2          Q.   Let me strike that.

3               Please turn to Figure 2.

4          A.   Okay.  Figure 2.

5          Q.   That carving along the top---

6          A.   Yes.

7          Q.   ---is that carving the same as the

8     carving on the outside of the canopy shown in the 947

9     patent?

10         A.   Up here (indicating)?

11         Q.   Yes.

12         A.   These are different.

13         Q.   Are they substantially different?

14         A.   They're different.

15         Q.   I'm going to have you take a look at

16    Defendant's Exhibit Number 16.

17              Do you recognize what this is -- the

18    document is, Defendant's Exhibit Number 16?

19         A.   Yes.  I recognize the dining table.

20         Q.   It's a dining table?

21         A.   Dining table.

22         Q.   Is it a United States patent?

23         A.   United States design patent.

24         Q.   439,770; is that correct?

25         A.   439,770, yes.

1   the 763 patent, did you intend to have the same

2   design starting from the bottom of the pilaster on

3   the left going up around the crown and then down the

4   pilaster on the right?

5        A.   They vary a little bit when they curve.

6   It changes the size a little bit when you start

7   turning it.

8        Q.   The shape changes or the---

9        A.   It's the same shape.  It's the same

10  shape.  It goes all the way around, but when it -- it

11  changes a little bit when it bows over a little bit,

12  but it's the same.

13       Q.   But was it your intention to have it

14  pretty close?

15       A.   But it's basically the same.

16       Q.   The crown is basically the same as the---

17       A.   Yes.

18       Q.   ---pilaster design?

19       A.   Yes.  That view, everything's the same.

20       Q.   Okay.  Okay.  I'm putting before you

21  again Defendant's Exhibit Number 10.  The---  You can

22  keep that open.  The carving along the top of the

23  canopy, do you see that?

24       A.   Up here (indicating)?

25       Q.   Yes.

Case 1:01-cv-00957-JAB   Document 71   Filed 01/15/03  Page 63 of 69

1      A.   Uh-huh.

2      Q.   Is that the same carving that's on the

3   pilaster and crown of the 763 patent?

4      A.   They're different.

5      Q.   Are they substantially different?

6      A.   They're different.

7      Q.   I'm going to put before you Defendant's

8   Exhibit Number 23 and have you take a look at that.

9   Do you know what that document is?

10      A.   It's a United States design patent.

11      Q.   United States design patent 448,204; is

12   that correct?

13      A.   448,204.

14      Q.   And what's shown in this design patent?

15      A.   It's an armoire.

16      Q.   And you're listed as one of the

17   inventors.  Do you believe yourself to be an

18   inventor?

19      A.   Yes.

20      Q.   Okay.  Now, turning to Figure 1 of

21   the 204 patent---

22      A.   Okay.

23      Q.   ---comparing the pilaster of the design

24   patent in Figure 1 of---  Strike that.

25           Comparing the pilaster shown in Figure 1

1    it, no.

2          Q.   Okay.  But you did see documents?  Fair

3    enough.

4          Can you flip to page 3 of what I've

5    marked as Defendant's Exhibit Number 25.

6          A.   Here?

7          Q.   Yeah.  Page 3, please, or the third page.

8          A.   Page 3.  This one (indicating)?

9          Q.   Yeah.  Do you see the cocktail table in

10    the upper right-hand corner?

11          A.   This right here (indicating)?

12          Q.   Yes.  Does this cocktail table have bun

13    feet?

14          A.   Yes.  That would be called bun foot.

15          Q.   Bun foot.  Is the bun foot shown in the

16    cocktail table in Defendant's Exhibit Number 25 the

17    same as the bun foot shown in Figure 1 of the 763

18    patent?

19          A.   They're different; stylistic difference.

20          Q.   They're noticeably different?

21          A.   They're different, stylistic.

22          Q.   But you noticed the difference pretty

23    quick, didn't you, just looking at the two?

24          A.   Yeah.  I know my design.  I know that

25    wasn't my design.

1    Q.   Okay.  Is it fair to say that bun feet

2  are common design elements in furniture?

3    A.   Yeah, they're common.  Yes.

4    Q.   And today I've shown you two other

5  designs for bun feet.  Are there other designs for

6  bun feet that you've seen in the past?

7    A.  Yes.

8    Q.   Okay.  So do you have a general idea how

9  many?

10    A.   No.  I don't know how many.  It's a lot.

11    Q.   A lot?  Hundreds?

12    A.   I don't know.

13    Q.   Okay.  But the bun foot in Figure 1 of

14  the 763 patent, you designed yourself?

15    A.   Yeah.  We designed that bun foot, that

16  shape and all, the carving.

17    Q.   Okay.  In designing the cabinet shown in

18  the 763 patent, have you ever seen a cabinet that has

19  a crowned top before, in general?

20    A.   You're talking about just the arch?

21    Q.   Yeah.  Is that what you would call this

22  portion, "an arch"?

23    A.   Yeah.  There's some -- they're

24  different--- I've seen not that, but I've seen

25  similarity.

1        Q.    Did you ever see a prototype of this bed?

2        A.    I'm trying to think back.  Yes, I think

3  we did see an earlier prototype, not this exact bed,

4  but it was similar to this.

5        Q.    Do you know when you saw that prototype?

6        A.    No, I don't.

7        Q.    Turning to Figure 1 of design patent

8  980 -- turning to Figure 1, I'm going to place before

9  you again Defendant's Exhibit Number 18, which shows

10  that definition for "twist turning."

11        A.    Uh-huh.

12        Q.    And referring to the picture of the twist

13  turning that has a big "R" that labels the twist

14  turning---

15        A.    Uh-huh.

16        Q.    ---is that twist turning shown in

17  Defendant's Exhibit Number 18 the same twist turning

18  that is shown in the posts of the bed shown in

19  the 980 patent?

20        A.    This is different because it has a

21  carving on it.

22        Q.    Oh, so there's a---  Where is the carving

23  on the post in the 980 patent?

24        A.    It goes around the twist turning.

25        Q.    That makes the twist turning of the bed

1          Q.    A finial.   Is it correct to say that

2    you've seen finials on the top of posts before?

3          A.    They're very common.

4          Q.    They're very common?

5          A.    Yes.

6          Q.    And how many finials do you think you've

7    seen on the top of bed posts?

8          A.    I don't know.   A lot.

9          Q.    Hundreds?

10          A.    Yeah.   Finials, yes.

11          Q.    Have you ever seen this specific finial

12    before?

13          A.    Now, Scott designed that finial.   And I

14    know that, for a specific carving detail in there.

15          Q.    So the specific carving on that finial is

16    new?

17          A.    New.   The carving is new.   But the

18    finial---

19          Q.    Finial is---   Is it fair to say that a

20    finial is a common design element for bed-post tops?

21          A.    Yeah.   That's common.

22          Q.    Okay.   I'm going to place in front of you

23    what we've marked -- previously marked as Defendant's

24    Exhibit Number 26 and have you take a look at that.

25          A.    Uh-huh.   United States design

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| BERNHARDT, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:01CV00957** |
| | ) | |
| COLLEZIONE EUROPA, USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **DECLARATION OF BRUCE W. DUNKINS IN SUPPORT OF COLLEZIONE'S BRIEF WITH RESPECT TO CONSTRUCTION OF U.S. PATENT NOS. 439,763, 439,727, 439,770, 441,975, AND 441,980 CLAIMS** and **DECLARATION OF BRETT M. HUTTON, ESQ. IN SUPPORT OF COLLEZIONE'S BRIEF WITH RESPECT TO CONSTRUCTION OF U.S. PATENT NOS. 439,763, 439,727, 439,770, 441,975, AND 441,980 CLAIMS** upon counsel for Plaintiff via facsimile and by hand delivery, and addressed as follows:

Stephen Robinson
Norwood Robinson
ROBINSON & LAWING, L.L.P.
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103-1835
Facsimile: (336) 631-6999
*Attorneys for Plaintiff*

This the 15th day of January, 2002.

PETER J. JURAN
N.C. State Bar No. 13566
*Attorney for Defendant*

OF COUNSEL:
BLANCO TACKABERY COMBS & MATAMOROS, P.A.
P. O. Drawer 25008
Winston-Salem, NC 27114-5008
Telephone: (336) 761-1250
Facsimile: (336) 761-1530

BTCM:164297.1