

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No. 01 C 000957**

| | |
|---|---|
| **BERNHARDT LLC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **COLLEZIONE EUROPA U.S.A.,** | ) |
| | ) |
| **Defendant.** | ) |

**DECLARATION OF BRUCE W. DUNKINS**
**IN SUPPORT OF COLLEZIONE'S BRIEF WITH RESPECT**
**TO CONSTRUCTION OF U.S. DESIGN PATENT NOS.**
**439,763, 438,727, 439,770, 441,975, AND 441,980 CLAIMS**

I, **BRUCE W. DUNKINS**, declare and say as follows:

1.      I am currently retired after working thirty-five years in the United States Patent

and Trademark Office ("US PTO") as a design patent examiner.  A copy of my current

curriculum vitae is attached as **Exhibit 1**.

2.      In 1954, I received a B.S. degree in Chemistry from Howard University. After

graduating from Howard University, I joined the US PTO as a design patent examiner.  In 1967, I

became a primary examiner with the US PTO.  As a primary examiner, I had full signatory status

authorizing me to sign all office actions, including office actions, which finally disposed of a

design patent application.  From 1989 until my retirement in 1991, I was a supervisory patent

examiner in design art unit no. 293 at the US PTO.  As a supervisory patent examiner, I directed

the activities of fifteen design patent examiners.

1

3.     During my thirty-five years at the US PTO, I examined approximately 12,000 design patent applications covering a wide range of articles in a wide assortment of classes, including furniture. I am familiar with the US PTO guidelines and requirements for design patent applications. As part of my duties as a design patent examiner, I would examine design patent applications and compare these designs to the prior art to determine their points of novelty and compare their overall appearance to the prior art to determine if the designs are new and/or non-obvious to a person of ordinary skill in the art. As part of my duties to determine if a design is new, I would compare patent application designs to prior art designs to determined if their overall appearances were substantially the same from the eye of an ordinary consumer.

4.     I have been retained on behalf of Collezione Europa U.S.A., Inc. ("Collezione") to testify as a design patent expert regarding certain matters at issue in this litigation. I am being compensated my normal consulting rate for my time working on this matter.

5.     I make this Declaration in support of Collezione's Brief With Respect To Construction of U.S. Design Patent Nos. 439,763 ("the '763 patent"), 438,727 ("the '727 patent"), 439,770 ("the'770 patent"), 441,975 ("the '975 patent"), 441,980 ("the '980 patent") and 441,560 Claims.

## I.     United States Patent No. 439,763

6.     I have reviewed and am familiar with the '763 patent and its prosecution history. The prosecution history contains the entire record of proceedings between the patentee and the Patent Office. A copy of the '763 patent is attached hereto as **Exhibit 2.**

7.     The '763 patent claims an "ornamental design for a cabinet, as shown and

2

described." The '763 patent has three (3) drawings showing and describing the same cabinet design.

8.     The cabinet depicted in the '763 patent includes a specific frieze surrounding the sides (e.g. along the pilasters) and arched portion (e.g. along crown) of the doors. This cabinet also includes specific intricately carved bun feet and a base having stepped base molding that is wider at the bottom than the top (in pyramid fashion). These features give the cabinet of the '763 patent a particular overall appearance. See Exh. 2, Fig. 1.

9.     The '763 patent depicts a specific frieze, specific carved bun feet and a specific base and thus does not encompass all frieze positioned around the doors, bun feet or bases. If Bernhardt desired to claim any frieze, bun feet and base, it could have shown these features in broken lines to exclude the specific frieze, bun feet and base from the claimed design. The Manual of Patent Examining Procedure ("MPEP"), which contains the relevant Patent Office guidelines, states that:

> [T]he two most common uses of broken lines are to disclose the environment related to the claimed design and to define the bound of the claim. Structure that is not part of the claimed design, but is considered necessary to show the environment in which the design is associated, may be represented in the drawing by broken lines. This includes any portion of an article in which the design is embodied or applied to that is not considered part of the claimed design. In re Zahn, 617 F.2d 261, 204 USPQ 988 (CCPA 1980)." MPEP 1503.02.

10.    The prior art is crowded with bun feet designs for furniture. In fact, one of the inventors admits that bun feet are common design elements in furniture design. (See Hutton Exhs. C, McDaniel 77:1-7, submitted herewith). For example, the cocktail table (no. 5428) shown on page 45 of the 1973 Alonzi catalog (**Exhibit 3**) includes bun feet. The bun feet shown

3

in this prior art Alonzi catalog appears more similar to the bun feet in Collezione's 2200 cabinet than the bun feet in the '763 patent. In fact, the inventors acknowledge that the bun feet in the '763 patent and the Alonzi catalog are different. (See Hutton Ex. B, Coley 128:17 to 129:2; Ex. C, McDaniel 76:4-25, submitted herewith). The same Alonzi catalog includes a curio cabinet having a frieze that surrounds the cabinet door.

11.　　In view of the prior art teachings and the admission from the inventors, the use of bun feet as an ornamental motif would be clearly obvious to any ordinary person in the furniture field and the use thereof would not consist of an advancement in the art. Also, the use of a frieze around the door of a curio cabinet is not new. Therefore, the '763 patent claim depicts and is limited to the specific bun feet and frieze around the doors shown in the design patent.

12.　　Bernhardt has identified the following points of novelty for the '763 patent:

| | |
|---|---|
| # 1 | A curio cabinet having a round arched top that rests, or appears to rest, on crown molding that begins at the top of each pilaster and continues back horizontally across the sides of the cabinet |
| # 2 | A distinctive decorative scroll-work frieze on the front top section along the curve of the arch. |
| # 3 | A distinctive decorative scroll-work frieze on the pilasters |
| # 4 | Sides of wooden framed transparent glass that reach from the base molding to the crown molding at the bases of the arch, with straight muntin (or mullion) approximately one third of the way up from the bottom of the frame, and shelves made of transparent glass inside the cabinet. |
| # 5 | Doors that extend from the curved decorative frieze on the arched top down to the base molding, each such door being a mirror image of the other and each being hinged on the pilaster side of the cabinet so as to open outward, having straight bottoms and sides and a top curved so as to follow the curve of the arched top, with the front of the arched top immediately below the decorative frieze on the arch. |
| # 6 | Muntin (or mullion) about one third of the way up from the bottom of each of the two doors that, together, forms a serpentine shape across the front of the cabinet. |

4

| # 7 | On each door, filagree (or lattice work), similar in design to that used on the doors of the buffet protected by the '727 patent, that extends from, and fills the area between, the bottom frame of the door up to the muntin. |
| # 8 | A base surrounded on the outer edge of the front and sides by stepped base molding that is wider at the bottom than the top (in pyramid fashion), rounded projections at each of the front facing bottom corners and the entire cabinet resting upon four intricately carved bun feet at each of the four bottom corners. |

13.    With respect to alleged point of novelty #1, a curio cabinet having a rounded arched top that rests, or appears to rest, on crown molding that begins at the top of each pilaster and continues back horizontally across the sides of the cabinet is found in the prior art including U.S. Design Patent Nos. 313,707 and 421,857 (See **Exhibits 5 and 6**, respectively), which were both found in the prosecution history of the '763 patent.

14.    With respect to alleged point of novelty # 2, the '763 patent depicts and is limited to the specific decorative scroll-work frieze on the front top section along the curve of the arch shown in the drawings, rather than covering any decorative frieze as suggested by the identified point of novelty. If Bernhardt desired to claim any decorative frieze, it could have shown the frieze in broken lines to exclude the specific frieze from the claimed design. Further, the decorative scroll-work frieze is substantially similar to the frieze along the top of the Louis XV Curio Cabinet (no. 7055) shown in the 1973 Alonzi catalog (See **Exhibit 3**).

15.    With respect to alleged point of novelty #3, the '763 patent depicts and is limited to the distinctive decorative scroll-work frieze on the pilasters, rather than covering any decorative frieze as suggested by the identified point of novelty. If Bernhardt desired to claim any decorative frieze on the pilaster, it could have shown the frieze in broken lines to exclude the

5

specific frieze from the claimed design. Further, the decorative scroll-work frieze is substantially similar to the frieze running along the sides of the Louis XV Curio Cabinet (no. 7055) shown in the 1973 Alonzi catalog (See **Exhibit 3**). Also, the scroll-work frieze along the pilaster appears to match the frieze along the curve of the arch, which was identified by Bernhardt as point of novelty #2.

16.     With respect to point of novelty #4, sides of a curio cabinet of wooden transparent glass that reach from the base molding to the crown molding at the bases of the arch, with straight muntin (or mullion) approximately one third of the way up from the bottom of the frame, and shelves made of transparent glass inside the cabinet are found in the prior art including U.S. Design Patent Nos. 345,872 and 421,857 (See **Exhibits 8 and 6** respectively). Also, the '763 patent is indefinite because FIG. 1 shows four glass shelves and a thick rectangular molding along the inside sides and back at the bottom of the rounded arched top portion of the cabinet, while FIG. 2 (which is identified as being a front view of the same cabinet in FIG. 1) shows five glass shelves and no rectangular molding on the inside along the sides and back. See **Exhibit 2**, FIGS. 1 and 2.

17.     With respect to alleged point of novelty # 8, a base surrounded on the outer edge of the front and sides by stepped base molding with the entire cabinet resting upon four bun feet is found in U.S. Design Patent No. 421,857 (**Exhibit 6**) and rounded projections at each of the front facing bottom corners is found in the prior art including U.S. Design Patent No. 313,707 (**Exhibit 5**). Also, bun feet are admitted common design elements in furniture design by the inventors and are found in the prior art including, for example, the cocktail table (no. 5428)

6

shown on page 45 of the 1973 Alonzi catalog (See **Exhibit 3**).

18.     Based on the prior art in the prosecution history of the '763 patent and uncovered

during discovery, I consider the points of novelty of the '763 patent to be:

(1)   the specific distinctive decorative scoll-work frieze running along the pilasters on
the front of the cabinet, the frieze on each pilaster being broken into two pieces.
(2)   the specific distinctive decorative scroll-work frieze along the arched top of the
cabinet,  which is similar to the specific decorative frieze along the pilasters.
(3)   the specific base that steps down in pyramid fashion being wider at the bottom than
the top.
(4)   the specific intricately carved bun feet.
(5)   the muntin about one third of the way up from the bottom on each door.
(6)   the filagree between the muntin and the bottom of each door.

## II.     United States Patent No. 439,770

19.     I have reviewed and am familiar with the '770 patent and its prosecution history.

The prosecution history contains the entire record of proceedings between the patentee and the

Patent Office.  A copy of the '770 patent is attached hereto as **Exhibit 9.**

20.     The '770 patent claims an "ornamental design for a table, as shown and

described." The '770 patent has four (4) drawings showing and describing the same table design.

The application for the '770 patent was filed on October 10, 2000.  Therefore, the critical date

for invalidating the '770 patent under 35 U.S.C. §102(b) is October 10, 1999.

21.     The table depicted in the '770 patent is a table design having leaves in the table.

The '770 patent does not cover a table with these leaves out of the table since the drawings show

only various views of the same table.  The '770 patented design includes twist turning legs and

posts.  Each leg includes a trestle base and a block on top of each leg.  As shown in FIG. 1, each

trestle base appears to have a different cross-section.  For example, looking at FIG. 1 of the '770

7

patent, it appears that there are three different shapes for the trestle bases, including an octagonal shape, a square and a chamfered square. Each of the blocks on top of each leg appears to have an octagonal cross-section. These blocks on top of each leg are positioned on the corners of a rectangular apron underneath the table top with rectangular runners extending between each adjacent block. This apron is underneath the middle third of the table and does not extend to the ends of the table. The table top includes a stepped under molding running along the entire circumference of the table top and appears to have five sections based on the lines traversing the planking on the table top.

22.    The '770 patent depicts a specific twist turning for the legs and the stretcher and thus does not encompass all twist turning designs for the legs and the stretcher. If Bernhardt desired to claim any twist turning design, it could have shown the feature in broken lines to exclude the specific twist turning from the claimed design.

23.    The prior art includes twist turning for legs and stretchers of table designs. For example, a page from the Dictionary of Furniture by Charles Boyce (dated 1985) that was found in the prosecution history of the '770 patent states that "twist turning was often used for legs and stretchers in late 17th century furniture." (**Exhibit 10**). Also, the table design shown in a prior art Artificats International advertisement (model no. 736 San Sebastian Dining Table) (**Exhibit 11**) and a photograph produced by Bernhardt during discovery (See **Exhibit 12**) show similar twist turning legs and stretchers.

24.    The '770 patent depicts specific trestle bases and blocks for each table leg. If Bernhardt desired to claim any trestle base or block shape, it could have shown these features in

8

broken lines to exclude the specific trestle bases and blocks. The prior art includes trestle bases and blocks on the top of each leg having chamfered square cross-sections. (**Exhibit 14**).

25. Bernhardt has identified the following points of novelty for the '770 patent:

#1 A trestle table design in which the legs posts and stretchers are each rope-turnings having a relatively large cross-section or diameter in comparison to more usual table legs, each leg post having three and one half to four "twists" (depending on viewing angle), the turnings of each stretcher having the same number of "twists" per unit of length as the legs and the stretchers being of the same diameter as the leg posts

#2 Four end stretchers, each of which runs at an angle from a trestle base on each leg post to a trestle base at the end of a central stretcher so as to form a pair of opposing open "Y" shapes

#3 The foregoing trestle bases on each leg post appearing to connect and separate the rope turning above it to a bun foot below it, and the trestle bases at the ends of the central stretcher each also having a bun foot.

#4 The foregoing trestle bases on each leg post being the chamfered square of the turning with ring turnings above it and the trestle bases at the ends of the central stretcher being a roughly cubical square of the turning with molding on the top surface

#5 The top of each leg post being a chamfered square of the turning of same diameter as the trestle base on the leg which connect four runners, in rectangular relation each to the other that forms, or appears to form, the base for the table top.

#6 A long four sided top that is roughly rectangular except that the two shorter edges at the ends of the table are a distinctive serpentine shape while the two long side edges are straight.

#7 A stepped under molding running along the entire circumference of the table top

#8 Clearly visible and distinct planking on the top surface of the table.

26. With respect to alleged point of novelty #1, the prior art includes trestle table designs in which the legs posts and stretchers are each rope-turnings, each leg post having three and one half to four "twists" (depending on viewing angle), the turnings of each stretcher having the same number of "twists" per unit of length as the legs and the stretchers being of the same

9

diameter as the leg posts. For example, the table designs shown in a prior art Artificats International advertisement (model no. 736 San Sebastian Dining Table) (**Exhibit 11**) and a photograph produced by Bernhardt during discovery (**Exhibit 12**) show twist turning legs and stretchers. Moreover, the rope turning or twisted design element of the legs and stretcher is a common design element for table legs and stretchers. In fact, as stated in a 1985 Dictionary of Furniture by Charles Boyce, twist turnings were often used for legs and stretchers in late 17th century furniture (**Exhibit 10**).

      27.     With respect to alleged point of novelty # 2, four end stretchers, each of which runs at an angle from a trestle base on each leg post to a trestle base at the end of a central stretcher so as to form a pair of opposing open "Y" shapes are found in the prior art including the two cocktail tables (nos. 1430-6 and 1420-6) on page 73 and the desk (no. 477) on page 17 of a Heckman Furniture catalog with a Patent Office date received stamp of May 30, 1973 (**Exhibit 13**), the oak extending dining table (no. F 142 C) on page 43 of the Furniture by Harrods dated 1989 (**Exhibit 14**), the table shown on page 384 of the 1996 American Manufactured Furniture catalog (**Exhibit 15**), and the Square Cocktail Table (no. 88-127) on page 2 of a Montreau by Heritage catalog having a Patent Office date received stamp of May 1979 (See **Exhibit 16**).

      28.     With respect to alleged points of novelty # 3, # 4, and #5, the trestle bases on each leg post and at the top of each leg post do not appear to show a chamfered square. In fact, the table bases shown in FIG. 1 of the '770 patent (**Exhibit 9**) appear to show three different shapes of trestle bases: (1) the two rear trestle bases having a square cross-section as clearly shown by the square edges shown in the drawing (similar to the cubical square trestle base at the ends of

10

the central stretcher); (2) the front left trestle base having an octagonal cross-section showing three sides facing outwardly that are of the same width; and (3) the front right trestle base having an octagonal cross-section showing two sides facing outwardly that are of different widths. In any event, those elements are not consistently shown throughout the several views of the drawings. The trestle bases appear to differ significantly from the counterpart showing of these bases in the other views. Also, the trestle bases at the ends of the central stretcher of FIG. 1 appear to differ significantly from the counterpart showing of these bases in the other views. For example, the trestle base at the ends of the central stretcher appears cubical in FIG. 1 and octagonal in FIG. 3.

29.     With respect to alleged point of novelty #8, clearly visible and distinct planking on the top surface of the table is found in U.S. Design Patent No. 376,059 (**Exhibit 17**).

30.     Based on the prior art in the prosecution history of the '770 patent and uncovered during discovery, I consider the points of novelty of the '770 patent to be:

    (1)     the stepped undermolding running along the entire circumference of the tabletop.
    (2)     the variety of shaped trestle bases on each table leg
    (3)     the octagonal blocks on the top of each leg that form the base of the table top with four rectangular runners connecting adjacent octagonal blocks, this base being positioned underneath the bottom third of the table.

## III.  United States Design Patent No. 438,727

31.     I have reviewed and am familiar with the '727 patent and its prosecution history. The prosecution history contains the entire record of proceedings between the patentee and the Patent Office. A copy of the '727 patent is attached hereto as **Exhibit 18.**

32.     The '727 patent claims an "ornamental design for a buffet, as shown and

11

described." The '727 patent has four (4) drawings showing and describing the same buffet design.

33.     The buffet depicted in the '727 patent includes a specific decorative acanthus leaf frieze running along the front and side top outside edge of the buffet. This frieze is broken up into multiple sections at the corners of the buffet and corners of the breakfront by a flower design. If Bernhardt desired to claim any frieze, it could have shown this feature in broken lines to exclude the specific frieze from the claimed design. Since the '727 patent shows only the specific frieze, it is limited to that specific frieze, and does not cover any other decorative frieze. The buffet depicted in the '727 patent also include four doors of equal width and height. Each of the doors has a decorative filagree design all of the same height and width.

34.     Bernhardt has identified the following points of novelty for the '727 patent:

# 1     An overhanging top having rounded corners on the front facing side and square corners on the rearward facing side, a milled rounded edge that projects out slightly from the flat top surface running along the front and side edges, and having the central half of the outward facing long side thrusting slightly outward by means of concave projections, so as to echo and maintain the degree of overhang over the breakfront of the center of the buffet.

# 2     An original decorative acanthus leaf frieze running along the front and side top outside edge of the buffet said frieze being framed between narrow strips of molding and further being parallel to the buffet top and the floor.

# 3     Rounded pilasters perpendicular to the floor on each of the outside front corners of the buffet.

# 4     A break front which is echoed by a corresponding break in the overhanging top and base molding.

# 5     Four rectangular doors of approximately equal width on the front of the buffet, said doors together covering nearly the entire front portion of the buffet between the decorative frieze and the base molding, the two doors on the left hand side of the buffet being hinged on the left side and the doors on the right side of the buffet being hinged on the right hand side, and further having the inner two doors covering the majority of the break

12

front between the frieze and the base molding.

    # 6    A characteristic design for each of the four above described doors in which an outer frame molding on each door surrounds the particular decorative filagree design shown and depicted in the '727 patent

    # 7    A multi-stepped base molding on the front and sides of the buffet and touching or appearing to touch, the floor throughout its length, projecting outward from the plane of the doors and the side panels by approximately the same amount as the overhang of the top and similarly echoing the outward projection of the breakfront.

    # 8    The use of common radii in the rounded front edge corners of the top, the pilasters, on the frieze above the pilasters and on the base molding below the pilasters, and the common radii of the concave projections that provide the outward thrust of the break front on the top, frieze, door frames and base molding.

35.    Many features of the buffet that were identified as points of novelty, such as, for example, door size and swing direction, are functional and, therefore, cannot be included as part of a point of novelty.

36.    With respect to alleged point of novelty #1, an overhanging top having rounded corners on the front facing side and square corners on the rearward facing side, a milled rounded edge that projects out slightly from the flat top surface running along the front and side edges, and having the central half of the outward facing long side thrusting slightly outward by means of concave projections, so as to echo and maintain the degree of overhang over the breakfront of the center of the buffet is found in the prior art including the buffet (no. 3302) on page 17 of a Hawthorn II catalog having a handwritten date of August 25, 1975 in the Patent Office (See **Exhibit 19**), the credenza (no. 153-154) in a Sketchbook by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 20**) and the buffet in a Montreau by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 16**).

13

37.     With respect to alleged point of novelty #2, a decorative frieze running along the

front and side top outside edge of the buffet, the frieze being framed between narrow strips of

molding and further being parallel to the buffet top and the floor is found in the prior art

including U.S. Design Patent Nos. 234,177 (See **Exhibit 21**) and 412,413 (See **Exhibit 22**), the

buffet (no. 3302) on page 17 of a Hawthorn II catalog having a handwritten date of August 25,

1975 in the Patent Office (See **Exhibit 19**), the credenza (no. 356-140) in the 1973 Cabernet by

Drexel catalog (See **Exhibit 23**), and the buffet in a Montreau by Heritage catalog with a Patent

Office date received stamp of 1979 (See **Exhibit 16**).   Further, the '727 patent depicts and is

limited to the specific decorative acanthus leaf frieze shown in the drawings, rather than any

decorative frieze as suggested by the identified point of novelty.  If Bernhardt desired to claim

any decorative frieze in this location, it could have shown the frieze in broken lines to exclude

the specific frieze from the claimed design.  The frieze just above the pilasters on the side corners

and the break front corners break up the frieze running along the front and sides of the buffet.

38.     With respect to alleged point of novelty #3, rounded pilasters perpendicular to the

floor on each of the outside front corners of the buffet are found in the prior art including U.S.

Design Patent Nos. 234,177 (**Exhibit 21**), 386,628 (**Exhibit 24**) and 425,329 (**Exhibit 25**).

39.     With respect to alleged point of novelty #4, a breakfront which is echoed by a

corresponding break in the overhanging top and base molding is found in the prior art including

the buffet (no. 3302) on page 17 of a Hawthorn II catalog having a handwritten date of August

25, 1975 in the Patent Office (See **Exhibit 19**), the Floridita Buffet in the Havana Collection by

Thomasville with a Patent Office date received stamp of 1998 (**Exhibit 26**), the buffet in a

14

Montreau by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 16**), and the credenza (no. 153-154) in a Sketchbook by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 20**).

40.    With respect to alleged point of novelty #5, four rectangular doors of approximately equal width on the front of the buffet, said doors together covering nearly the entire front portion of the buffet between the decorative frieze and the base molding, the two doors on the left hand side of the buffet being hinged on the left side and the doors on the right side of the buffet being hinged on the right hand side, and further having the inner two doors covering the majority of the break front between the frieze and the base molding is found in the prior art including U.S. Design Patent Nos. 231,815 (**Exhibit 27**), the buffet (no. 3302) on page 17 of a Hawthorn II catalog having a handwritten date of August 25, 1975 in the Patent Office (**Exhibit 19**), the Floridita Buffet in the Havana Collection by Thomasville with a Patent Office date received stamp of 1998 (**Exhibit 26**) and the buffet in a Montreau by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 16**).

41.    With respect to point of novelty #6, a characteristic design for each of the four doors in which an outer frame molding on each door surrounds the particular decorative filagree design shown and depicted in the '727 patent is found in the prior art including the buffet in a Montreau by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 16**), the Floridita Buffet in the Havana Collection by Thomasville with a Patent Office date received stamp of 1998 (**Exhibit 26**), and U.S. Design Patent No. 231,815 (**Exhibit 27**).

42.    With respect to point of novelty # 7, a multi-stepped base molding on the front

15

and sides of the buffet and touching or appearing to touch, the floor throughout its length, projecting outward from the plane of the doors and the side panels by approximately the same amount as the overhang of the top and similarly echoing the outward projection of the breakfront is found in the Floridita Buffet in the Havana Collection by Thomasville with a Patent Office date received stamp of 1998 (**Exhibit 26**), the credenza (no. 153-154) in a Sketchbook by Heritage catalog with a Patent Office date received stamp of 1979 (**Exhibit 20**), the credenza (no. 356-140) in the 1973 Cabernet by Drexel catalog (**Exhibit 23**), and U.S. Design Patent Nos. 231,815 (**Exhibit 27**) and 232,889 (**Exhibit 28**).

43. The use of a common radii in the rounded front edge corners of the top, the pilasters, and on the base molding below the pilasters, and the common radii of the concave projections that provide the outward thrust of the break front on the top, door frames and base molding is not adequately depicted in the '727 patent, especially in light of Bernhardt's point of novelty #7 which alleges a multi-stepped base molding. Moreover, assuming that the '727 patent adequately shows this feature, the use of common radii in the rounded front edge corners of the top, the pilasters, and on the base molding below the pilasters, and the common radii of the concave projections that provide the outward thrust of the break front on the top, door frames and base molding is found in the prior art including U.S. Design Patent Nos. 425.329 (**Exhibit 25**) and 386,628 (**Exhibit 24**), and the credenza (no. 356-140) in the 1973 Cabernet by Drexel catalog (**Exhibit 23**).

44. Based on the prior art in the prosecution history of the '727 patent and uncovered during discovery, I consider the points of novelty of the '727 patent to be:

16

(1)  the specific decorative acanthus leaf frieze running along the front and side top edge of the buffet. The frieze is broken into four pieces at the outside front corners and break front corners by a flower design.

(2)  the decorative filagree of equal height and width on each of the four doors.

## IV.  United States Design Patent No. 441,975

45.  I have reviewed and am familiar with the '975 patent and its prosecution history. The prosecution history contains the entire record of proceedings between the patentee and the Patent Office. A copy of the '975 patent is attached hereto as **Exhibit 29.**

46.  The '975 patent claims an "ornamental design for a chair, as shown and described." The '975 patent has five (5) drawings showing and describing an arm chair and a side chair that Bernhardt claims are different embodiments of one design. The application for the '975 patent was filed on October 12, 2000. Therefore, the critical date for invalidating the '975 patent under 35 U.S.C. §102(b) is October 12, 1999.

47.  The chair depicted in the '975 patent includes a specific acanthus leaf carving on the top front of the seat back. If Bernhardt desired to claim any carving at this location, it could have shown this carving in broken lines to exclude the specific carving from the claimed design. The prior art includes chairs having a leaf carving on the top front of the seat back. (See **Exhibit 30**). However, the inventors admit that the carving shown on the chairs in **Exhibit 30** are different than the leave carving shown in the '975 patent. (Hutton Ex. B, Coley 92:19 to 93:20; Ex. C, McDaniel 52:13 to 53:12, submitted herewith). In view of these prior art teachings, the use of carving as an ornamental motif on the top front of the seat back would be clearly obvious to any ordinary person in the furniture field and the use thereof would not consist of an advancement in the art. Therefore, the '979 patent claim depicts and is limited to the specific

17

acanthus leaf carving shown in the design patent.

48. Bernhardt has identified the following points of novelty for the '975 patent:

#1 A wooden framed dining room chair with an upholstered back and seat, as more fully described herein, having two embodiments, armed and unarmed.

#2 The back of each seat is set back at slightly more than 90° degree angle from the seat. The top of the back of the seat is the characteristic serpentine shape that is one of the unifying elements of the Coronado collection and the front of the top bears an intricate acanthus leave carving reminiscent of the frieze of '727 buffet. The sides of the frame of the back are straight and are a continuous piece with the rear legs.

#3 The front of the back is a padded upholstered cushion set within and surrounded by the wooden frame. The sides and bottom of the cushion are straight while the top has the same serpentine shape as the top of the frame. The cushion ends slightly above the seat. On the frame, in the gap between the seat and the back is a double bead.

#4 The seat of the chair is a large plush upholstered cushion, slightly domed on top, having straight sides and back and slightly rounded corners. The front of the cushion is serpentine shaped.

#5 The legs are carved and scrolled in the Louis XIV style. Each front and rear leg is joined by a serpentine side rail. The two side rails are joined near the front of the chair by a serpentine cross rail.

#6 In the armchair embodiment, the arms of the chair are also wood carved and scrolled in the Louis XIV style. Each arm angles slightly out and downward from the frame of the back and ends at about the level of the end of the seat cushion. In the front, each arm is connected to the seat frame by a scrolled, somewhat serpentine, stile that angles back from the front of the seat and attaches beneath the arm, slightly back of the curve of the scrolling on the front of the arm.

49. With respect to point of novelty #1, the general design concept of a wooden framed dining room chair with an upholstered back and seat is not protectable by design patents. The furniture art is extremely crowded with many wooden framed dining room chairs with an upholstered back and seat. Also, many features of the chair are functional and, therefore, can't be part of a point of novelty

18

50.     With respect to point of novelty #2, the '975 patent depicts and is limited to the specific intricate acanthus leaf carving on the top front of the back of the seat shown in the views of the patent drawing, rather than covering any carving as suggested by the identified point of novelty. If Bernhardt desired to claim any decorative carving on the top front of the back of the seat, it could have shown the carving in broken lines to exclude the specific carving from the claimed design.   Other examples of carvings or patterns on the top front of the back of the seat are found in the prior art including the arm chair (no. 84-706) in basic/witz Furniture catalog Dining for the 70's having a Patent Office date received stamp of March 21, 1973 (**Exhibit 31**) and the chairs shown in a Thomasville Furniture catalog having a Patent Office date stamp of January 23, 1973 (**Exhibit 30**).

51.     With respect to point of novelty #3, a padded upholstered back cushion set within and surrounded by a wooden frame having straight sides and bottom and serpentine top and ending slightly above the seat is found in the prior art including many of the chairs shown on page 67 of the Chairs and Couches by Curtis published in 1977 (**Exhibit 32**).   Additional serpentine tops are found in the arm chair (no. 84-706) in basic/witz Furniture catalog Dining for the 70's having a Patent Office date received stamp of March 21, 1973 (**Exhibit 31**), the arm chair (no. 25-6012A) in the 1979 Ethan Allen catalog (**Exhibit 33**), the chairs shown in a Thomasville Furniture catalog having a Patent Office date stamp of January 23, 1973 (**Exhibit 30**), the side chair (no. 451-715) in the March 1964 Esperanto by Drexel catalog (**Exhibit 34**), and the arm chair (no. 31-75) in the Kindel French Provincial Louis XV Collection catalog having a Patent Office date received stamp of March 21, 1973 (**Exhibit 35**).

19

52.     With respect to point of novelty #4, a large plush upholstered cushion chair seat that is slightly domed on top having straight sides and back and slightly rounded corners is found in the prior art including many of the chairs shown on page 67 of the Chairs and Couches by Curtis published in 1977 (**Exhibit 32**), on the high back chair and open arm chair shown on page 10 of the Karpen Furniture catalog published in 1925 (**Exhibit 36**), and on the chairs shown on page 10 of the Liesenbein's sons catalog having a Patent Office date received stamp of October 18, 1924 (**Exhibit 37**). The '975 patent does not adequately depict the front of the cushion chair seat as having a serpentine shape as indicated by Bernhardt's alleged point of novelty #4. In any case, a seat cushion having a serpentine shape front is found in the prior art including the arm chair (no. 31-75) in the Kindel French Provincial Louis XV Collection catalog having a Patent Office date received stamp of March 21, 1973 (**Exhibit 35**)

53.     With respect to point of novelty #5, the serpentine side rails that join the front and rear legs and are joined near the front of the chair by a serpentine cross rail are found in the prior art including the front cover of the Sketchbook by Heritage with a Patent Office date stamp of 1979 (**Exhibit 20**), the side chair (no. 451-715) in the March 1964 Esperanto by Drexel catalog (**Exhibit 34**), the game chair (No. 9743) on page 8 and the host chair (no 9545) on page 10 in the Madero catalog having a Patent Office date received stamp of March 23, 1973 (**Exhibit 38**), and the arm chair (no. 452-734) in the Velero by Drexel catalog having a Patent Office date received stamp of March 23, 1973 (**Exhibit 39**). The carved and scrolled legs are found in the chair (no. 3064) on page 10 of the Liesenbein catalog with a Patent Office date received stamp of 1924 (**Exhibit 37**), the 17th Century Armchair with scrolled arms and legs in the French manner of

Louis XIII on page 228 of the Baroque/Spanish Furniture (**Exhibit 40**), and the game chair (No. 9743) on page 8 and the host chair (no 9545) on page 10 in the Madero catalog having a Patent Office date received stamp of March 23, 1973 (**Exhibit 38**).

54.     Based on the prior art in the prosecution history of the '975 patent and uncovered during discovery, I consider the point of novelty of the '975 patent to be:

(1)     the specific intricate acanthus leaf carving on the top front of the seat back.
(2)     the specific arm design in the arm chair embodiment.

### V.    United States Design Patent No. 441,980

55.     I have reviewed and am familiar with the '980 patent and its prosecution history. The prosecution history contains the entire record of proceedings between the patentee and the Patent Office.  A copy of the '980 patent is attached hereto as **Exhibit 41**.

56.     The '980 patent claims an "ornamental design for a bed, as shown and described." The '980 patent has six (6) drawings showing and describing the same table design.  The application for the '980 patent was filed on October 13, 2000.  Therefore, the critical date for invalidating the '980 patent under 35 U.S.C. §102(b) is October 13, 1999.

57.     The bed depicted in the '980 patent includes twist turning headboard and footboard posts with a specific intricately carved finial on top of each post.  In the grooves of the turnings on each of the post is a continuous series of carved acanthus leaves.  The footboard posts are each separated into two pieces by a specific urn-shaped turning.

58.     The '980 patent depicts a specific carved finial, urn-shaped turning and twist turning for the posts and thus does not encompass all finials, twist turning designs for the posts

and turnings that break up the posts. If Bernhardt desired to claim any finial, twist turning design or turnings, it could have shown the feature in broken lines to exclude the specific twist turning from the claimed design.

59.     The inventors admit that finial designs are not new. Thus, the '980 patent depicts and is limited to the specific finials shown in the drawings. Also, the prior art includes twist turning for posts and turnings that break up these posts of bed designs. For example, a prior art publication that the inventors of the '980 patent referred to while designing the bed design of the '980 patent includes numerous examples of twist turnings for bed posts and turnings for breaking up these bed posts. (**Exhibit 42**; Hutton Ex. B, Coley 35:20 to 36:25, submitted herewith).

60.     Bernhardt has identified the following points of novelty for the '980 patent:

> # 1     A serpentine shaped headboard surmounted by a serpentine cornice with ogee molding blending into a cove on the left and right most sides of the headboard.
>
> # 2     Three recessed panels on the front of the headboard of equal width, each extending from near the bottom of the headboard to a point near the top. Each panel is framed by molding which projects outward from the plane of the headboard and the recessed edges are likewise molded. The top of each of the three panels is shaped such that, in combination, they follow the line of the serpentine shape of the headboard.
>
> # 3     Two relatively massive turned end posts on either side of the headboard, each extending well above the cornice of the headboard. The top portion of each post, beginning at a point slightly below the cornice, is rope turned with a continuous series of carved acanthus leaves trailing around the grooves of the turning. The tops of the posts are intricately carved ovoid, or acorn shaped, finials. The finials are separated from the rope turnings by two ring turnings. The bottom lengths of the end posts have a chamfered square cross-section. The chamfered and rope-turned potions of the posts are separated by two ring turnings. At the bottom of each post is a rounded, somewhat urn-shaped, foot.
>
> # 4     A rectangular footboard joined by two end posts that are approximately equal in height to the end posts of the headboard as more fully described herein.

22

#5    The front of the footboard had molding along its top and bottom. The top and bottom molding extends outward so as to overhang the front and rear planes of the footboard. The rear of the footboard is unadorned and flat other than the overhang of the molding.

#6    On the front of the footboard, slightly above the bottom molding, on the front of the footboard is a carved bead. The front of the footboard has two rectangular recessed panels, each with its long edge horizontal. Each panel is framed by molding that extends outward from the plane of the footboard and the pattern of the molding continues inward into the recess in a similar fashion to the recessed panels on the headboard.

#7    The posts of the footboard have turned, somewhat urn-shaped, feet like those on the head board. Above each foot is a chamfered square section similar in cross-section to that on the posts on the headboard, but shorter, extending only slightly above the horizontal top of the footboard. Above the chamfered square section is a rope-turned section having turnings and acanthus leaf carvings similar to those in the headboard posts. This rope-turned section is separated from the chamfered section by one small and one large ring turning. There is an urn-shaped turning that breaks the rope-carved section into two pieces of uneven length, approximately two-thirds to three quarters of the way up from the bottom of the rope-turned section. The footboard posts have the same type of finials as the headboard posts.

61.    With respect to alleged point of novelty #1, a serpentine shaped headboard surmounted by a serpentine cornice with ogee molding blending into a cove on the left and right most sides of the headboard is found in the prior art including U.S. Design Patent Nos. 423,245 (**Exhibit 43**), and 345,659 (**Exhibit 44**), and the poster bed on page 8 of the 1996 Thomasville catalog (**Exhibit 45**).

62.    With respect to alleged point of novelty #2, three recessed panels on the front of the headboard, each extending from near the bottom of the headboard to a point near the top, each panel framed by molding which projects outward from the plane of the headboard and the recessed edges are likewise molded, the top of each of the three panels being shaped such that, in combination, they follow the line of the serpentine shape of the headboard is found in the

23

prior art including U.S. Design Patent No. 371,253 (**Exhibit 46**) and the panel headboard (no. 390-318) in the 1983 Burlington Industries, Inc. catalog (**Exhibit 47**).

63.     A number of the features making up alleged point of novelty # 3 are found in the prior art or are not adequately depicted in the patent drawings.  For example, two relatively massive turned end posts on either side of the headboard, each extending well above the cornice of the headboard is found in the prior art including the bed on the front cover of the August 1991 Directions magazine (**Exhibit 48**) and U.S. Design Patent Nos. 421,855 (**Exhibit 43**), 376,054 (**Exhibit 49**).  The '980 patent depicts a specific intricately carved ovoid, or acorn shaped, finial on the top of the headboard posts.  If Bernhardt desired to claim any finial, it could have shown the finial in broken lines to exclude the specific finial from the claimed design.  The prior art is crowded with bed designs having different finials located on top of headboard posts.  For example, U.S. Design Patent Nos. 427,449 (**Exhibit 50**), 421,855 (**Exhibit 43**), 408,647 (**Exhibit 51**), 373,259 (**Exhibit 52**), 371,253 (**Exhibit 46**), 349,614 (**Exhibit 53**), 345,659 (**Exhibit 44**), and 81,340 (**Exhibit 54**) all include different finials on top of headboard posts. Moreover, the inventors of the '975 patent admitted that a finial on top of bed posts is not new. (Hutton Ex. B, Coley 44:4-15; Ex. C, McDaniel 88:1-10, submitted herewith).  Thus, the '980 patent claim depicts and is limited to the specific finial shown in the design patent.

64.     Although Bernhardt contends that the bottom length of the end posts have a chamfered square cross-section, this feature is not adequately depicted in the patent drawings. This is most noticeably in FIGS. 1 and 6, which appear to show a simple square head post by focusing on the sharp corners of the bottom length of the end posts.  Also, rounded, somewhat

24

urn-shaped feet at the bottom of each post are found in the prior art including the Portuguese bed found in the prosecution history of the '980 patent and used by the inventors as an inspiration for the bed design (**Exhibit 42**), U.S. Design Patent Nos. 408,647 (**Exhibit 51**), the Drexel Heritage bed shown on page 84 of the April 3, 2000 edition of Furniture/Today (**Exhibit 55**) and the bed on the front cover of the August 1991 Directions magazine (**Exhibit 48**).

65.    With respect to alleged point of novelty #4, a rectangular footboard joined by two end posts that are approximately equal in height to the end posts of the headboard is found in the prior art including U.S. Design Patent Nos. 373,259 (**Exhibit 52**) and 371,253 (**Exhibit 46**).

66.    With respect to alleged point of novelty #5, a footboard front having molding along its top and bottom that extends outward so as to overhand the front and rear planes of the footboard and the rear of the footboard being unadorned and flat is found in the prior art including U.S. Design Patent Nos. 408,647 (**Exhibit 51**) and 353,950 (**Exhibit 56**).

67.    With respect to alleged point of novelty #6, a footboard front having two rectangular recessed panels, each with is long edge horizontal that are framed by molding that extends outward from the plane of the footboard and the pattern of the molding continues inward in to the recess in a similar fashion to the recessed panel on the headboard is found in the prior art including U.S. Design Patent Nos. 353,950 (**Exhibit 56**) and 366,162 (**Exhibit 57**).

68.    A number of the features making up alleged point of novelty # 7 are found in the prior art. The rope turning or twisted column design element of the posts for both the footboard and headboard, as well as the breaks in the rope turning end posts (**Exhibit 42**), are considered common design elements for bed posts. For example, two relatively massive turned end posts on

25

either side of the footboard, each extending well above the cornice of the headboard is found in the prior art including the Portuguese bed found in the prosecution history of the '980 patent and used as an inspiration of the bed design (**Exhibit 42**; Hutton Ex. B, Coley 35:20 to 36:25, submitted herewith), U.S. Design Patent Nos. 421,855 (**Exhibit 43**) and 376,054 (**Exhibit 49**). The '980 patent depicts a specific intricately carved ovoid, or acorn shaped, final on the top of the headboard posts. The prior art is crowded with bed designs having different finials located on top of posts – See supra ¶77. The '980 patent claim depicts and is limited to the specific finial shown in the design patent. Although Bernhardt contends that the bottom length of the footboard end posts have a chamfered square cross-section, this feature is not adequately depicted in the views of the patent drawing. This is most noticeably in FIGS. 1 and 6 which appear to show a square head post by focusing on the sharp corners of the bottom length of the end posts. Also, rounded, somewhat urn-shaped feet at the bottom of each post are found in the prior art – See supra ¶ 79. The separation of the end posts and the bottom section of the footboard consisting of a turning is found in the prior art publication showing a Portuguese bed. (**Exhibit 42**).

69. Based on the prior art in the prosecution history of the '980 patent and uncovered during discovery, the points of novelty of the '980 patent are:

(1) the specific intricately carved acorn finials on top of each bed post.
(2) the specific continuous series of carved acanthus leaves trailing around the grooves of the turning posts of the headboard and the footboard.
(3) the specific urn-shaped turning that breaks the turned footboard posts into two pieces.
(4) The specific carved bead on the front of the footboard slightly above the bottom molding on the front of the footboard.

26

70.    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Declaration is true and correct.

Dated: January 8, 2003

Bruce W. Dunkins

# LARGE ATTACHMENTS - SEE ORIGINAL DOCUMENT